PER CURIAM.
Brandy Bain Jennings, who was twenty-six years old at the time of the crime, was convicted and sentenced to death for the November 1995 first-degree murders of Dorothy Siddle, Vicki Smith, and Jason Wiggins, all of which occurred during a robbery of the Cracker Barrel Restaurant in Naples. On direct appeal, we affirmed his convictions and sentences. See Jennings v. State, 718 So.2d 144 (Fla.1998). Jennings now appeals the denial of his *1108 motion for postconviction relief, filed pursuant to Florida Rule of Criminal Procedure 3.850,[1] and simultaneously petitions this Court for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. For the reasons expressed herein, we affirm the postcon-viction court’s denial of relief and deny Jennings’ petition for a writ of habeas corpus.
FACTS AND PROCEDURAL HISTORY
This Court summarized the pertinent facts underlying this crime on direct appeal as follows:
Dorothy Siddle, Vicki Smith, and Jason Wiggins, all of whom worked at the Cracker Barrel Restaurant in Naples, were killed during an early morning robbery of the restaurant on November 15, 1995. Upon arriving on the scene, police found the bodies of all three victims lying in pools of blood on the freezer floor with their throats slashed. Victim Siddle’s hands were bound behind her back with electrical tape; Smith and Wiggins both had electrical tape around their respective left wrists, but the tape appeared to have come loose from their right wrists.
Police also found bloody shoe prints leading from the freezer, through the kitchen, and into the office, blood spots in and around the kitchen sink, and an opened office safe surrounded by plastic containers and cash. Outside, leading away from the back of the restaurant, police found scattered bills and coins, shoe tracks, a Buck knife, a Buck knife case, a pair of blood-stained gloves, and a Daisy air pistol.
Jennings (age twenty-six) and Jason Graves (age eighteen), both of whom had previously worked at the Cracker Barrel and knew the victims, were apprehended and jailed approximately three weeks later in Las Vegas, Nevada, where Jennings ultimately made lengthy statements to Florida law enforcement personnel. In a taped interview, Jennings blamed the murders on Graves, but admitted his (Jennings’) involvement in planning and, after several aborted attempts, actually perpetrating the robbery with Graves. Jennings acknowledged wearing gloves during the robbery and using his Buck knife in taping the victims’ hands, but claimed that, after doing so, he must have set the Buck knife down somewhere and did not remember seeing it again. Jennings further stated that he saw the dead bodies in the freezer and that his foot slipped in some blood, but that he did not remember falling, getting blood on his clothes or hands, or washing his hands in the kitchen sink. Jennings also stated that the Daisy air pistol belonged to Graves, and directed police to a canal where he and Graves had thrown other evidence of the crime.
In an untaped interview the next day, during which he was confronted with inconsistencies in his story and the evidence against him, Jennings stated, “I think I could have been the killer. In my mind I think I could have killed them, but in my heart I don’t think I could have.”
At trial, the taped interview was played for the jury, and one of the officers testified regarding Jennings’ un-taped statements made the next day. *1109 The items ultimately recovered from the canal were also entered into evidence.
The medical examiner, who performed autopsies on the victims, testified that they died from “sharp force injuries” to the neck caused by “a sharp-bladed instrument with a very strong blade,” like the Buck knife found at the crime scene. A forensic serologist testified that traces of blood were found on the Buck knife, the Buck knife case, the area around the sink, and one of the gloves recovered from the crime scene, but in an amount insufficient for further analysis. An impressions expert testified that Jennings’ tennis shoes recovered from the canal matched the bloody shoe prints inside the restaurant as well as some of the shoe prints from the outside tracks leading away from the restaurant.
The State also presented testimony concerning previous statements made by Jennings regarding robbery and witness elimination in general. Specifically, Angela Chainey, who had been a friend of Jennings’, testified that about two years before the crimes Jennings said that if he ever needed any money he could always rob someplace or somebody. Chainey further testified that when she responded, “That’s stupid. You could get caught,” Jennings replied, while making a motion across his throat, “Not if you don’t leave any witnesses.” On cross-examination, Chainey further testified that Jennings had “made statements similar to that several times.”
The State also presented testimony concerning previous statements made by Jennings regarding his dislike of victim Siddle. Specifically, Bob Evans, one of the managers at Cracker Barrel, testified that Jennings perceived Siddle to be holding him back at work and that, just after Jennings quit, he said about Sid-dle, “I hate her. I even hate the sound of her voice.” Donna Howell, who also worked at Cracker Barrel, similarly testified that she was aware of Jennings’ animosity and dislike of Siddle, and that Jennings had once said about Siddle, “I can’t stand the bitch. I can’t stand the sound of her voice.”
The jury found Jennings guilty as charged. In the penalty phase, the defense presented mitigation evidence, including general character testimony from witness Mary Hamler, who testified on direct examination that she had lived with Jennings for two and one-half years. She also testified that Jennings had gotten along well with her children during that time, and that he cried when they (Jennings and Hamler) broke up.
On cross-examination, the State elicited testimony from Hamler that there was another side to Jennings’ character and that Jennings once said that if he ever committed a robbery, he would not be stupid enough to stick around, but would go north. Hamler further testified on cross-examination that Jennings was angry at Cracker Barrel in general, and Siddle in particular, for “jerking him around” and holding him back at work, and that in this regard Jennings once said of Siddle that “one day she would get hers.”
The defense presented further character evidence from several of Jennings’ friends that he was good with children, got along with everybody, and was basically a nonviolent, big-brother type who was happy-go-lucky, fun-loving, playful, laid back, and likeable. Jennings’ mother testified that her son never met his father and that she raised Jennings herself. She claimed that Jennings had been a straight-A student, but quit school to take care of her when she became sick.
*1110 The jury recommended death by a vote of ten to two as to each of the murders. In its sentencing order, the trial court found three aggravators: (1) that the murders were committed during a robbery; (2) that they were committed to avoid arrest; and (3) that they were cold, calculated, and premeditated (CCP).
The trial court found only one statutory mitigator: that Jennings had no significant history of prior criminal activity (some weight). The trial court explicitly found that two urged statutory miti-gators did not exist: that Jennings was an accomplice in a capital felony committed by another and that his participation was relatively minor; and that Jennings acted under extreme duress or under the substantial domination of another person. The trial court also found eight nonstatutory mitigators: (1) that Jennings had a deprived childhood (some weight); (2) that accomplice Graves was not sentenced to death (some weight); (3) that Jennings cooperated with police (substantial weight); (4) that he had a good employment history (little weight); (5) that he had a loving relationship with his mother (little weight); (6) that he had positive personality traits enabling the formation of strong, caring relationships (some weight); (7) that he had the capacity to care for and be mutually loved by children (some weight); and (8) that he exhibited exemplary courtroom behavior (little weight).
After evaluating the aggravators and mitigators, the trial court sentenced Jennings to death for each murder. The trial court also sentenced Jennings to fifteen years’ imprisonment for the robbery.
Jennings, 718 So.2d at 145-47 (footnotes omitted). This Court affirmed Jennings’ convictions and sentences. Id. at 155.[2] Jennings filed a petition for writ of certio-rari with the United States Supreme Court, which was denied. See Jennings v. Florida, 527 U.S. 1042, 119 S.Ct. 2407, 144 L.Ed.2d 805 (1999).
In March 2000, Jennings filed an initial motion for postconviction relief. He filed an amended motion in June 2000 and a second amended motion in August 2009, in which he raised twenty-five claims.[3] Fol *1111 lowing a Huff[4] hearing, the postconviction court granted an evidentiary hearing on five of Jennings’ claims: (1) trial counsel’s alleged failure to adequately impeach State witness Angela Cheney (a portion of claim 1 in Jennings’ second amended postconviction motion); (2) trial counsel was ineffective concerning the lack of a mental health evaluation (claim 3); (3) trial counsel failed to investigate mitigation evidence (claim 4); (4) trial counsel was ineffective for failing to challenge aspects related to the admission of Jennings’ statements to law enforcement (claim 6); and (5) trial counsel was ineffective for failing to raise issues about the sentencing order and the trial court’s consideration of nonstatutory mitigation (claim 20). Following a three-day evidentiary hearing, the postconviction court denied Jennings’ second amended motion for postconviction relief.
*1112 This appeal follows, and Jennings simultaneously petitions this Court for a writ of habeas corpus.
ANALYSIS
I. Rule 3.850 Claims
In Jennings’ appeal to this Court, he raises three claims. He first alleges that trial counsel rendered ineffective assistance of counsel for failing to discover and present sufficient mitigation evidence at the penalty phase of his trial. Second, Jennings alleges that trial counsel was also ineffective for failing to adequately impeach State witness Angela Cheney.[5] Lastly, he argues that the postconviction court erred in summarily denying several of his other postconviction claims. We address each issue in turn, beginning with Jennings’ ineffective assistance of penalty-phase counsel claim.

Ineffective Assistance of Penalty-Phase Counsel

In his first claim, Jennings raises an ineffectiveness challenge focusing on trial counsel’s allegedly inadequate performance during the penalty phase, as well as counsel’s alleged lack of preparation. Specifically, Jennings alleges that the pretrial mental health evaluations performed in this case were inadequate, that trial counsel did not conduct a full investigation of Jennings’ troubled childhood, and that trial counsel did not obtain or provide his experts with sufficient records to enable them to offer a fully informed opinion regarding mental health mitigation.
Following the United States Supreme Court’s decision in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), this Court has held that for ineffective assistance of counsel claims to be successful, a defendant must satisfy the following two requirements:
First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined. A court considering a claim of ineffectiveness of counsel need not make a specific ruling on the performance component of the test when it is clear that the prejudice component is not satisfied.
Schoenwetter v. State, 46 So.3d 535, 546 (Fla.2010) (quoting Maxwell v. Wainwright, 490 So.2d 927, 932 (Fla.1986)).
To establish the deficiency prong under Strickland, the defendant must prove that counsel’s performance was unreasonable under “prevailing professional norms.” Morris v. State, 931 So.2d 821, 828 (Fla.2006) (quoting Strickland, 466 U.S. at 688, 104 S.Ct. 2052). “A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel’s challenged conduct, and to evaluate the conduct from counsel’s perspective at the time.” Strickland, 466 U.S. at 689, 104 S.Ct. 2052. The defendant carries the burden to “overcome the presumption that, under the circumstances, the challenged action ‘might be considered sound trial strategy.’ ” Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)). “Judicial scrutiny of counsel’s performance must be highly deferential.” Id. “[Strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered *1113 and rejected and counsel’s decision was reasonable under the norms of professional conduct.” Occhicone v. State, 768 So.2d 1037, 1048 (Fla.2000).
“[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.” Strickland, 466 U.S. at 691, 104 S.Ct. 2052. “This Court has recognized that ‘the obligation to investigate and prepare for the penalty portion of a capital case cannot be overstated.’ ” Sexton v. State, 997 So.2d 1073, 1079 (Fla.2008) (quoting State v. Lewis, 838 So.2d 1102, 1113 (Fla.2002)). “Clearly, ‘[a]n attorney has a strict duty to conduct a reasonable investigation of a defendant’s background for possible mitigating evidence.’” Id. (quoting Ragsdale v. State, 798 So.2d 713, 716 (Fla.2001)). The focus of review should be “whether the investigation supporting counsel’s decision not to introduce mitigating evidence ... was itself reasonable.” Wiggins v. Smith, 539 U.S. 510, 523, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (citing Strickland, 466 U.S. at 691, 104 S.Ct. 2052). “Trial counsel will not be held to be deficient when [counsel] makes a reasonable strategic decision to not present mental mitigation testimony during the penalty phase because it could open the door to other damaging testimony.” Gaskin v. State, 822 So.2d 1243, 1248 (Fla.2002).
“Penalty phase prejudice under the Strickland standard is measured by whether the error of trial counsel undermines this Court’s confidence in the sentence of death when viewed in the context of the penalty phase evidence and the miti-gators and aggravators found by the trial court.” Hurst v. State, 18 So.3d 975, 1013 (Fla.2009). That standard does not “require a defendant to show ‘that counsel’s deficient conduct more likely than not altered the outcome’ of his penalty proceeding, but rather that he establish ‘a probability sufficient to undermine confidence in [that] outcome.’ ” Porter v. McCollum, 558 U.S. 30, 130 S.Ct. 447, 455-56, 175 L.Ed.2d 398 (2009) (quoting Strickland, 466 U.S. at 693-94, 104 S.Ct. 2052) (alteration in original).
Both prongs of the Strickland test present mixed questions of law and fact. Sochor v. State, 883 So.2d 766, 771 (Fla.2004). “In reviewing a trial court’s ruling after an evidentiary hearing on an ineffective assistance of counsel claim, this Court defers to the factual findings of the trial court to the extent that they are supported by competent, substantial evidence, but reviews de novo the application of the law to those facts.” Mungin v. State, 932 So.2d 986, 998 (Fla.2006).
Jennings presented eleven witnesses at the evidentiary hearing, including his lead trial counsel; three experts hired by postconviction counsel; and several friends and family members.[6] Jennings was represented at trial by Thomas Osteen, who testified at the evidentiary hearing that at the time of Jennings’ trial, he was the deputy public defender running the Collier County office. In addition, Jennings was represented by a second attorney, also with the public defender’s office, and counsel’s trial preparation was assisted by the chief investigator in the public defender’s office, who was a former law enforcement officer and whom Osteen described as having a “good feel” for mitigation information. While Osteen’s co-counsel had no experience in capital cases, Osteen had represented “[m]aybe 30” prior capital defendants in death penalty cases, the majority of which went to the penalty phase. At the evidentiary hearing, Osteen *1114 testified that he began his preparations for the penalty phase at about the same time as his trial preparation, speaking to Jennings’ mother and people that knew Jennings.
Jennings’ argument that trial counsel was ineffective at the penalty phase has essentially two components. First, Jennings alleges that trial counsel failed to provide necessary documentation or guidance to his mental health experts and that because those experts conducted insufficient evaluations of Jennings, counsel’s decision to forego mental health mitigation in this case was not fully informed or reasonably determined. Second, Jennings alleges that counsel’s mitigation investigation was minimal, consisting only of interviews with Jennings’ mother and individuals who knew Jennings in adulthood, and that substantial mitigation evidence about Jennings’ troubled childhood and history of substance abuse therefore went undiscovered. We address each of these arguments in turn.

Mental Health Mitigation

Jennings’ first contention is that the decision to forego mental mitigation in this case was unreasonable and based on insufficient and incomplete information. On this point, the postconviction court found as follows:
Mr. Osteen testified that he moved for the appointment of two mental health experts, Dr. Wald and Dr. Masterson, with whom he had previously worked in several cases, who knew what he was looking for, and who knew what he wanted in their reports. He further testified that he always spoke with the doctors after their reports were submitted and received more details than were included in the reports. He stated that the experts were retained to determine the defendant’s competency and the existence of any mitigators. Once he reviewed the reports, Mr. Osteen concluded that the doctors would not be helpful. He testified that this was not a strong mental health case, so he “chose to go a different route.” Mr. Osteen further testified that if he had the doctors testify, the contents of their reports would have been “fair game,” and by not calling them to testify, the jury was not informed of specific details which may have harmed defendant. Counsel cannot be ineffective for making a reasonable strategic decision to forego presentation of mitigating evidence that would likely have been more harmful than helpful and could have damaged defendant’s chances with the jury.
(Citations omitted.) After a full review of the record, we conclude that the trial court’s factual findings are supported by competent, substantial evidence.
We further conclude that trial counsel made “a reasonable strategic decision to not present mental mitigation testimony during the penalty phase because it could open the door to other damaging testimony.” Gaskin v. State, 822 So.2d at 1248. Trial counsel made this decision based on his experience, the reports of competent experts, and his strategy of emphasizing Jennings’ many positive character traits over his negative traits. Specifically, trial counsel testified at the evidentiary hearing that he was concerned that the mental mitigation was not particularly strong and had the potential to do more harm than good by revealing Jennings’ extensive drug use and prior criminal acts. Counsel cannot be found deficient for choosing to pursue other mitigation evidence that he determined was more likely to help Jennings at trial. See Winkles v. State, 21 So.3d 19, 26 (Fla.2009) (“This Court previously has found no deficiency where trial counsel made a strategic decision not to present expert witness testimony after investigat *1115 ing and concluding that the testimony would be more harmful than helpful.”); Willacy v. State, 967 So.2d 131, 143-44 (Fla.2007) (finding that counsel could not be considered deficient when mental mitigation evidence “would have opened the door to aggravating facts,” such as the defendant’s prior bad acts and negative personality traits).
Jennings nevertheless argues that the information on which trial counsel made the determination to forego mental mitigation was incomplete, in that counsel failed to provide his experts with complete school and medical records. He also contends that the mental health experts were themselves inadequate. Jennings relies primarily on the postconviction testimony presented at the evidentiary hearing of Dr. Hyman Eisenstein, a clinical psychologist hired by postconviction counsel, who detailed what he perceived as the many inadequacies in Dr. Masterson’s pretrial report. Dr. Eisenstein performed numerous neuropsychological tests of Jennings in 2000 and again in 2010 and concluded that Jennings’ performance was indicative of “some brain disregulation.” Following his 2010 evaluation, Dr. Eisenstein diagnosed Jennings with a learning disorder and with intermittent explosive disorder.
With respect to Dr. Eisenstein’s testimony, the postconviction court found as follows:
Dr. Eisenstein criticized Dr. Master-son’s report, stating his opinion that Dr. Masterson did not put it all together in his report, did not list all the tests performed, and did not list all the raw data. Dr. Eisenstein disagreed with some of Dr. Masterson’s conclusions and how Dr. Masterson listed Defendant’s test results. However, Dr. Eisenstein conceded that this was a difference of opinion, that Dr. Masterson’s report eluded [sic] to many of the same issues he had testified to, and that Dr. Masterson used the correct tests available at the time. He admitted that there was no authority that dictated how to write a report and that is [sic] was possible a report might be tailored to meet an attorney’s needs. While Dr. Eisenstein complained that there was a whole battery of tests available that Dr. Masterson could have performed on defendant, he admitted there were no required tests.
In light of Mr. Osteen’s testimony that he chose to retain experts who were familiar with what he wanted to see and always spoke with his experts to obtain more detail than was listed in the reports, the Court finds Dr. Eisenstein’s criticism of Dr. Masterson’s report to be mere semantics.... That the defendant has now offered expert opinions different from those of the experts appointed before trial does not mean relief is warranted. Trial counsel made a reasonable tactical decision not to pursue further mental health investigation after receiving an initial diagnosis that there was no mental health mitigation, and that initial diagnosis is not rendered incompetent merely because defendant has now secured the testimony of an expert who gives a more favorable diagnosis. Defense counsel is entitled to rely on the evaluations conducted by qualified mental health experts, even if, in retrospect, those evaluations may not have been as complete as others may desire.
(Citations and paragraph numbers omitted.) The postconviction court further found that Dr. Wald’s and Dr. Masterson’s reports “show they were aware of and considered defendant’s history of head injuries, drug and alcohol use, and childhood psychiatric treatment for anger issues,” which were all issues raised by postconvic *1116 tion counsel through testimony at the evi-dentiary hearing.
The postconviction court’s factual findings are supported by competent, substantial evidence in the record, and the court did not err as to its legal conclusions. Jennings predominantly attributes the deficiencies in the presentation of mental health mitigation to the experts and not to counsel, and the postconviction court found that Dr. Eisenstein’s criticisms of Dr. Mas-terson’s report amounted to “mere semantics.” Thus, Jennings has failed to establish that trial counsel was deficient for not presenting mental mitigation at trial. See Sexton, 997 So.2d at 1084-85. As this Court has previously stated, the fact that a defendant “produced more favorable expert testimony at his evidentiary hearing is not reason enough to deem trial counsel ineffective.” Peede v. State, 955 So.2d 480, 494 (Fla.2007). Trial counsel cannot be deficient for relying on the evaluations of qualified mental health experts, “even if, in retrospect, those evaluations may not have been as complete as others may desire.” Darling v. State, 966 So.2d 366, 377 (Fla.2007).
Moreover, although Jennings argues that trial counsel did not provide his experts with complete school or medical records, Dr. Wald’s report indicates that he reviewed Lee County school records, as well as medical records from the Collier County Jail. Further, even assuming trial counsel should have sought further records, Jennings has not demonstrated prejudice. Although Dr. Eisenstein testified at the evidentiary hearing that he had reviewed additional records, Jennings has not shown what specific information in these records was different from the information to which counsel was already privy, or what effect those additional records would have had.
Accordingly, we affirm the denial of relief on this claim.

Childhood and Background Mitigation

Jennings also alleges that trial counsel conducted an insufficient background investigation of available mitigation information in this case. In support of his argument, Jennings presented testimony from Dr. Faye Sultan, a clinical psychologist hired by postconviction counsel, and from several individuals who knew Jennings and his mother during Jennings’ childhood. Dr. Sultan testified in particular that through her investigation, she learned of pervasive sexual abuse in Jennings’ family. Dr. Sultan’s evaluation of Jennings, however, revealed similar findings to those of Dr. Masterson’s pretrial report, and her review of Dr. Masterson’s and Dr. Wald’s reports indicated that they did address Jennings’ history of substance abuse but not, in her opinion, “the severity of [Jennings’] substance abuse” or the sexual violence. Dr. Sultan opined that, although Jennings does not suffer from any major mental illness, he “is quite a damaged person” and he “operates in the world ... in a highly dysfunctional way.”
Jennings also presented testimony at the evidentiary hearing from his cousin, Patricia Scudder, and her husband Lloyd, both of whom testified that Jennings was exposed to child molesters in his youth and that Jennings’ mother exhibited poor parenting skills. However, Patricia also testified that the relationship between Jennings and his mother was “very loving” and that Jennings’ mother was “very, very overly protective” of Jennings.
Jennings argues that this postconviction testimony on the whole establishes that trial counsel was ineffective for failing to discover and present as mitigating evidence the history of sexual abuse and incest in Jennings’ family and the dysfunctional home situation in which Jennings *1117 was raised. Jennings contrasts these witnesses’ testimony with that of trial counsel, who testified that “[i]f there was one thing Mr. Jennings had, he had a mother. A good one.” Jennings thus suggests that counsel was deficient for failing to uncover mitigating information about Jennings’ childhood and for relying on Jennings’ mother to establish the mitigation he chose to present.
On this claim, the postconviction court found as follows:
As it relates to information regarding sexual abuse or emotional neglect, Mr. Osteen could not be ineffective for failing to present evidence of which he was not aware, since he testified this information was not reported to him. In fact, in Dr. Masterson’s report, defendant specifically denied any history of sexual abuse. Furthermore, sexual abuse of defendant’s mother or other family members would not be significantly mitigating. In Dr. Wald’s report, defendant also denied being intoxicated or under the influence of drugs at the time the crimes were committed. Mr. Osteen testified that he chose to rely on the positive statements by defendant’s mother and friends, and the good, loving relationship between defendant and his mother in order to attempt to elicit sympathy from the jury. Again, this was proper trial strategy to focus on positive information, rather than negative information such as poverty or extreme drug and alcohol use.
(Citation omitted.) As the postconviction court’s findings demonstrate, this is not a case where trial counsel failed to investigate, obtain, or provide any background information to the experts and therefore could not have made a reasoned strategic decision about its presentation. Cf. State v. Riechmann, 777 So.2d 342, 350 (Fla.2000) (holding that counsel’s performance was deficient where he “was unable to provide any explanation as to why he did not conduct an investigation or contact witnesses available to him”). Trial counsel stated that it was his practice that either he or his investigator would ask about a history of sexual abuse and that it “never came up as an issue” in this case. Counsel further testified that he spoke to Jennings’ mother several times and that he tried to arrange for her to meet with Dr. Wald but that she did not want to participate. None of the witnesses counsel questioned, including Jennings and his mother, revealed any history of sexual abuse in the family, and Jennings specifically denied that he himself had been abused. In previous cases, we have found that trial counsel was not deficient for failing to present evidence of sexual abuse when the defendant, who was the abuse victim, denied or did not inform counsel or mental health experts about it. See, e.g., Anderson v. State, 18 So.3d 501, 510 (Fla.2009); Morton v. State, 995 So.2d 233, 240 (Fla.2008); Davis v. State, 928 So.2d 1089, 1110 (Fla.2005).
The facts of this case present an even stronger reason not to find deficient performance by trial counsel because, in this case, the defendant was not the victim of the abuse and counsel testified that it was his practice to affirmatively ask potential witnesses about any history of sexual abuse. Counsel cannot be deemed deficient for failing to discover and present evidence of sexual abuse in Jennings’ family when none of the witnesses questioned provided any information to suggest that there was a history of familial abuse. See Carroll v. State, 815 So.2d 601, 614 (Fla.2002) (stating that the reasonableness of counsel’s decisions may be influenced by the defendant’s own statements).
Even assuming trial counsel should have learned about the abuse of Jennings’ family members through other *1118 means, Jennings has not demonstrated prejudice. While information concerning the sexual abuse of his family members might have been mitigating in establishing Jennings’ troubled childhood and emotional development, the trial court found as nonstatutory mitigation that Jennings had a deprived childhood, and the presentation of this testimony might have run contrary to counsel’s reasonable strategic decision of finding friends who could speak positively about Jennings. In addition, this information does not rise to the level of unpresented mitigation previously held to be prejudicial. Cf. Winkles, 21 So.3d at 27 (finding that unpresented testimony that the defendant himself had suffered sexual abuse was not prejudicial).
Jennings’ further contention that trial counsel should have done more to investigate out-of-state friends and records is likewise unavailing. Counsel was already aware of Jennings’ childhood background through Jennings’ own detailed self-reports, and in any event, this presentation would have been contrary to counsel’s strategic decision, based on his investigation, to present positive penalty-phase witnesses who could speak to Jennings’ good character traits.
In sum, we conclude that the postconviction court did not err in finding that trial counsel was not ineffective for failing to obtain or present childhood and background mitigation. Jennings has not “overcome the presumption that, under the circumstances, the challenged action ‘might be considered sound trial strategy.’ ” Strickland, 466 U.S. at 689, 104 S.Ct. 2052 (quoting Michel, 350 U.S. at 101, 76 S.Ct. 158). Accordingly, we deny relief on this claim.

Failure to Impeach

Jennings next asserts that trial counsel was ineffective for failing to adequately investigate and impeach State witness Angela Cheney at trial. The postcon-viction court denied this claim, finding that Jennings’ postconviction counsel did not question trial counsel about any alleged failure to adequately cross-examine Cheney and that Jennings therefore “failed to present any evidence that would show Mr. Osteen was in any way deficient on this issue.” After considering the pertinent testimony from both the evidentiary hearing and Jennings’ trial, we conclude that trial counsel was in fact deficient with respect to this claim. However, a close examination of the record in this case reveals that Jennings has not established that trial counsel’s failure in this regard “so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined.” Pittman v. State, 90 So.3d 794, 812 (Fla.2011) (quoting Maxwell, 490 So.2d at 932). Accordingly, we deny relief on this claim.
Angela Cheney testified at Jennings’ trial regarding a statement Jennings made in November 1993. According to Cheney, Jennings said that if he ever needed money, “he could always rob someplace or somebody.” When Cheney told Jennings that he could get caught, Jennings replied, while making a gesture across his throat, “Not if you don’t leave any witnesses.” On cross-examination, Cheney indicated that Jennings had made similar statements “several times.” Jennings’ trial counsel questioned Cheney on cross-examination only about the context in which the original statement occurred and when Cheney alerted police to Jennings’ remark.
At the evidentiary hearing, Cheney testified that she was friends with Jennings’ codefendant, Jason Graves, in high school and that she met Jennings through Graves. Cheney dated Jennings for about a month, after which she did not maintain any friendship or acquaintance with Jennings. Cheney later married Graves’ *1119 brother, but was either in the process of divorce or already divorced from him when she testified at Jennings’ trial. Cheney also testified that she had thirty or forty conversations with Graves after he and Jennings were arrested for the Cracker Barrel murders, that she was concerned for Graves’ physical and emotional well-being while he was in jail, that she attended the first meeting with Graves’ lawyers, and that her husband at the time (Graves’ brother) was present with her when she gave her statement to police regarding Jennings’ prior comments.
Although the postconviction court denied this claim, the court did note that Jennings had established that trial counsel should have been aware, based on information provided during pretrial discovery, of the nature of Cheney’s relationships with both Jennings and Graves, and of what Cheney would testify to at trial. Given the information trial counsel knew from discovery material, a complete review of the trial transcript reveals that counsel was deficient with respect to his preparation for and cross-examination of Cheney. The cross-examination consisted merely of a few basic questions and actually led Cheney to disclose that Jennings had made several statements similar to the one to which she originally testified on direct examination. Counsel’s failure to inquire of Cheney regarding the nature of her relationships with Jennings and Graves, and of her desire to help Graves, was unreasonable under prevailing professional standards.
Cheney’s testimony at the evidentiary hearing that her trial testimony was truthful and uninfluenced by her relationship with Graves does not alter our assessment of counsel’s cross-examination. Determining the credibility of a witness is up to the jury, and by failing to question Cheney about her potential motivations and biases in this case, regardless of whether any such biases influenced her testimony, counsel deprived the jury of the ability to make a fully informed decision about Cheney’s credibility. This is not a case where the jury had other “ample information from which to assess [the witness’s] credibility and weigh [her] testimony accordingly.” Robinson v. State, 707 So.2d 688, 694 (Fla.1998). Furthermore, there is no suggestion that trial counsel had any strategic reason to limit his cross-examination of Cheney. See, e.g., Hannon v. State, 941 So.2d 1109, 1122 (Fla.2006) (finding no deficient performance when defense counsel made “reasonable strategic decisions ... in an attempt to avoid confusing the jury by attacking a witness that was not relevant to the defense case”). Thus, given the available impeachment evidence and the incriminating nature of Cheney’s testimony, trial counsel’s failure to adequately prepare for and cross-examine Cheney was deficient performance.
Because we have concluded that counsel was deficient with respect to this claim, it is necessary to determine whether Jennings was prejudiced as a result. Jennings argues that prejudice is evident because Cheney’s testimony helped to establish guilt and two aggravators in the penalty phase. Indeed, the trial court’s sentencing order and this Court’s direct appeal opinion refer to Cheney’s testimony in finding and upholding the avoid arrest aggravator and CCP. See Jennings, 718 So.2d at 150-52. This Court also referred to Cheney’s testimony in concluding that the evidence was sufficient to support Jennings’ murder convictions. See id. at 154. However, we conclude that Jennings has not demonstrated that counsel’s deficient performance on this issue undermines the Court’s confidence in the outcome of either the guilt phase or penalty phase of Jennings’ trial.
*1120 While this Court did note Jennings’ “past statements about committing a robbery and not leaving any witnesses” in finding that the evidence was sufficient to support Jennings’ murder convictions, see id., these statements did not represent the only evidence against Jennings, and the State presented considerable other evidence of Jennings’ guilt such that trial counsel’s failure to impeach Cheney does not undermine confidence in the jury’s guilty verdict in this case. Specifically, Jennings made inculpatory statements to law enforcement, owned the murder weapon, and left bloody shoe prints leading away from the murder scene. See id.
With respect to CCP, this Court stated the following on direct appeal:
The scenario of events supports the elements of a calculated plan and heightened premeditation. We begin with witness Chainey’s [sic] testimony that, approximately two years before these crimes, Jennings made general statements and gestures to the effect that if he ever needed any money, he would simply rob someplace or someone and eliminate any witnesses by slitting their throats. Moreover, Jennings admitted to several aborted robbery attempts of the Cracker Barrel in close proximity to the actual crimes that he ultimately committed there.
Evidence of a plan to commit a crime other than murder (such as, in this case, robbery) is in and of itself insufficient to support CCP. However, the execution-style murders, combined with the advance procurement of the murder weapon, the previously expressed dislike for victim Siddle, and the previously expressed intent not to leave any victims if robbery were committed are all additional factors that support the elements of a calculated plan and heightened premeditation. The evidence here does not suggest a “robbery gone bad.”
Id. at 152 (citation omitted). Although it is true that the trial court and this Court noted Cheney’s testimony in finding CCP in this case, other evidence supported the CCP aggravator. The trial court also cited Jennings’ established dislike for one of the victims, the speed with which the robbery and murders were accomplished, and Jennings’ ownership of the murder weapon as evidence of “a plan that was carried out with ruthless efficiency.” Id. Further, in affirming the death sentences, this Court noted the execution-style nature of the killings, id., which the Court has previously said are inherently “cold.” Wright v. State, 19 So.3d 277, 299 (Fla.2009). Indeed, as outlined by the Court on direct appeal, the very nature of the way these murders were committed — binding the victims, placing them in the freezer, and then slashing their throats — alone strongly supports a finding of CCP.
We recognize that the trial court and this Court also cited Cheney’s testimony in finding and upholding the avoid arrest ag-gravator. However, regarding this aggravating circumstance, this Court found it “significant that the victims all knew and could identify their killer.” Jennings, 718 So.2d at 151. The Court also stressed that “the facts of the present case show that the victims had been bound,” and that “all three victims were confined to the freezer, and any immediate threat to Jennings could have been eliminated by simply closing and securing the freezer door.” Id. In other words, we emphasized multiple facts, including that Jennings used gloves and did not use a mask, that supported the avoid arrest aggravator, outside of the pri- or statements allegedly made by Jennings to Cheney.
While we recognize that Cheney’s testimony was used by the State both for guilt *1121 and for the CCP and avoid arrest aggrava-tors, the impeachment value of what was not presented must be considered in analyzing whether the defendant has demonstrated prejudice. Cf. Hunter v. State, 29 So.3d 256, 271 (Fla.2008) (stating that the impeachment value of the undisclosed evidence must be considered in determining whether prejudice ensued in the context of a newly discovered evidence claim). Although the information concerning Cheney’s relationships with Graves and Jennings would have been impeaching, it is unlikely that it would have entirely destroyed Cheney’s credibility as Jennings assumes. In Parker v. State, 89 So.3d 844, 868-69 (Fla.2011), we considered a similar argument regarding the value and effect of additional witness impeachment information and concluded that, although the information would have provided the jury with additional impeachment material regarding the witness’s motive to testify, it would not have destroyed the witness’s credibility. Similarly, the judge and jury in Jennings’ case were aware that Cheney was at one time friends with Graves and Jennings. We conclude that the jury would not have fully discounted Cheney’s testimony, as Jennings contends, even assuming an adequate cross-examination, simply because additional motives for testifying were brought forth.
In light of the fact that there was other compelling evidence that clearly supports Jennings’ guilt and the CCP and avoid arrest aggravators, Jennings has not established prejudice so as to undermine our confidence in the outcome of either the guilt phase or penalty phase of this case. Accordingly, we deny relief on this claim.

Summary Denial of Claims

Jennings next argues that the postcon-viction court erred in summarily denying various claims, primarily regarding ineffective assistance of counsel. Specifically, Jennings contends that three claims warranted an evidentiary hearing: (1) the prosecutor made improper comments at trial and Jennings’ trial counsel was ineffective for failing to object; (2) Jennings’ trial counsel was ineffective for failing to challenge forensic evidence presented at trial; and (3) Jennings’ trial counsel was ineffective for failing to challenge the admissibility of Jennings’ post-arrest statements. Because each of these claims is either procedurally barred, refuted by the record, or both, we affirm the postconviction court’s summary denial of all three claims.
A postconviction court’s decision of whether to grant an evidentiary hearing on a rule 3.850 motion is ultimately based on written materials before the court. Therefore, the court’s ruling is tantamount to a pure question of law, subject to de novo review. See Van Poyck v. State, 961 So.2d 220, 224 (Fla.2007). When reviewing the summary denial of a claim raised in a rule 3.850 motion, the court must accept the movant’s factual allegations as true to the extent that they are not refuted by the record. Occhicone, 768 So.2d at 1041. Generally, a defendant is entitled to an evidentiary hearing on a rule 3.850 motion unless: (1) the motion, files, and records in the case conclusively demonstrate that the movant is entitled to no relief; or (2) the motion or particular claim is legally insufficient. Freeman v. State, 761 So.2d 1055, 1061 (Fla.2000). The defendant bears the burden of establishing a prima facie ease based on a legally valid claim; mere conelusory allegations are insufficient. Id.
With this background established, we now address each of Jennings’ three summarily denied claims in turn.

Improper Prosecutorial Arguments

In his first claim, Jennings asserts that the postconviction court erred in *1122 summarily denying his claim that the prosecutor made improper comments during his trial and that his trial counsel was ineffective for failing to object. To the extent Jennings argues that the comments themselves were improper, this issue is procedurally barred because it should have been raised on direct appeal. See Spencer v. State, 842 So.2d 52, 60 (Fla.2003) (“[Cjlaims of prosecutorial misconduct could and should have been raised on direct appeal and thus are procedurally barred from consideration in a postconviction motion.”). In addition, Jennings’ argument that the prosecutor took inconsistent positions between his trial and the trial of codefendant Graves was previously litigated and rejected, and is therefore likewise procedurally barred. See Jennings, 718 So.2d at 154.
With respect to Jennings’ ineffective assistance of counsel claims, Jennings initially asserts that trial counsel was ineffective for failing to object to improper comments at the guilt phase of his trial. However, Jennings does not point to any specific comments in particular. We therefore deny this part of Jennings’ claim. See Patton v. State, 878 So.2d 368, 380 (Fla.2004) (holding that conclusory allegations are insufficient for appellate purposes).
Next, Jennings asserts that trial counsel was ineffective for failing to object to improper prosecutorial comments at the penalty phase of his trial, and he cites to three instances in which he alleges that trial counsel should have objected. Jennings first challenges the prosecutor’s comment that the presentation of mitigation evidence was “another desperate effort to escape accountability.” Jennings has not established, however, how this comment prejudiced his trial. This claim was therefore properly summarily denied by the postconviction court.
Jennings also alleges that the prosecution argued impermissible aggravating circumstances in stating that Jennings spent the robbery money at a “topless dance club.” The assertion that Jennings visited a “topless dance club” after the robberies was supported by trial testimony from a club employee, and in any event, there is nothing in the record to suggest that the trial court relied on any impermissible aggravating factors in sentencing Jennings to death.
Finally, Jennings takes issue with the prosecutor’s comment that Jennings’ codefendant was convicted of the same crime and sentenced to life imprisonment. Again, however, Jennings has not established how this comment prejudiced his penalty-phase proceeding. Additionally, the trial court found the codefendant’s life sentence to be a mitigating factor, and it is therefore illogical for Jennings to now argue that trial counsel was ineffective for failing to object to the prosecutor’s reference to mitigation evidence submitted by defense counsel and found by the trial court.
Accordingly, we deny relief on this claim.

Forensic Evidence

In his second claim, Jennings asserts that the postconviction court erred in summarily denying his claim that trial counsel was ineffective for failing to challenge the forensic evidence presented at trial. Because this claim is legally insufficient, we deny relief.
Jennings argues that his trial counsel failed to investigate the crime scene and the forensic evidence presented by the State and that counsel was deficient for failing to call any expert to testify on Jennings’ behalf. However, while Jennings generally argues that trial counsel *1123 should have presented his own forensic witnesses to rebut the State’s evidence, he does not allege what specific information other experts would have been able to offer or how this presentation would have impacted the case. Without more specific factual allegations about how further investigation or challenge of the State’s evidence would have benefited Jennings, trial counsel cannot be deemed deficient. See Bryant v. State, 901 So.2d 810, 821 (Fla.2005) (“[W]hen a defendant alleges ineffective assistance of counsel for failure to call specific witnesses, a defendant is ‘required to allege what testimony defense counsel could have elicited from witnesses and how defense counsel’s failure to call, interview, or present the witnesses who would have testified prejudiced the case.’” (quoting Nelson v. State, 875 So.2d 579, 588 (Fla.2004))). Accordingly, summary denial was proper. See Freeman, 761 So.2d at 1061 (stating that “[m]ere conclusory allegations are not sufficient” to meet the defendant’s burden).

Admissibility of Statements

In his third and final claim, Jennings asserts that the postconviction court erred in summarily denying his claim that trial counsel was ineffective for failing to raise issues related to Jennings’ post-arrest statements. Although Jennings challenges the postconviction court’s summary denial of this claim, we note at the outset that Jennings was granted an evidentiary hearing with respect to his claim that trial counsel was ineffective for failing to establish that Jennings was not competent to waive his constitutional Miranda rights and for failing to object to the admission of Jennings’ statements. The record reflects, however, that aside from briefly inquiring whether trial counsel was aware of any substance abuse by Jennings around the time he gave his confession to police, Jennings did not present any witnesses or make any argument at the evidentiary hearing regarding this claim.
Accordingly, it appears that the only issue Jennings is now raising with respect to the admission of his post-arrest statements is the postconviction court’s summary denial of his contention that trial counsel was ineffective for failing to fully investigate and effectively cross-examine a key State witness about the circumstances surrounding Jennings’ statements. Jennings argues that if trial counsel had properly investigated discrepancies between several versions of events relayed by witnesses in the case, counsel would have been able to effectively challenge the admissibility and reliability of Jennings’ statements. However, Jennings does not specifically allege what these inconsistencies are or what information trial counsel should have been aware of or used as impeachment evidence. Because he has not established what testimony would have been offered or what information would have been discovered through a more thorough investigation and questioning of the State witness, Jennings’ claim is legally insufficient, and the postconviction court’s summary denial was proper.
II. Habeas Corpus Petition
In his habeas corpus petition, Jennings argues that certain omissions by his appellate counsel on direct appeal constituted ineffective assistance of appellate counsel. “Claims of ineffective assistance of appellate counsel are appropriately presented in a petition for a writ of habeas corpus.” Chavez v. State, 12 So.3d 199, 213 (Fla.2009) (citing Freeman, 761 So.2d at 1069). To grant habeas relief on the basis of ineffectiveness of appellate counsel, this Court must resolve the following two issues:
*1124 [W]hether the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance and, second, whether the deficiency in performance compromised the appellate process to such a degree as to undermine confidence in the correctness of the result.
Bradley v. State, 33 So.3d 664, 684 (Fla.2010) (quoting Pope v. Wainwright, 496 So.2d 798, 800 (Fla.1986)). Under this standard, “[t]he defendant has the burden of alleging a specific, serious omission or overt act upon which the claim of ineffective assistance of counsel can be based.” Anderson, 18 So.3d at 520 (quoting Freeman, 761 So.2d at 1069). Importantly, “[i]f a legal issue ‘would in all probability have been found to be without merit’ had counsel raised the issue on direct appeal, the failure of appellate counsel to raise the meritless issue will not render appellate counsel’s performance ineffective.” Walls v. State, 926 So.2d 1156, 1175-76 (Fla.2006) (quoting Rutherford v. Moore, 774 So.2d 637, 643 (Fla.2000)). We address each of Jennings’ habeas claims in turn.

Admissibility of State Witness Testimony

In his first habeas claim of ineffective assistance of appellate counsel, Jennings argues that his appellate counsel was deficient for failing to challenge on direct appeal portions of the testimony of three State witnesses. Specifically, Jennings contends that appellate counsel should have raised the claim that Officer Robert Browning, examiner David Grimes, and Corporal Joe Barber used non-standard terminology to render expert testimony opinions. We discuss each witness individually.
Officer Browning, the supervisor of the Collier County Sheriffs Office crime scene section, testified at trial that blood transfers found in the kitchen of the Cracker Barrel Restaurant “looked like shoe tracks” going in a certain direction. Defense counsel objected to this testimony, stating that the witness was “testifying as an expert, giving his opinion as to reconstruction of the crime scene” and “not testifying just to what he saw.” The trial court overruled this objection, stating that the alignment of the blood tracks was “a physical observation.” Jennings now claims that it was error for appellate counsel not to raise this issue on direct appeal.
This argument is without merit. Jennings does not cite any case law or other authority to support his claim that appellate counsel should have raised this issue. Instead, he merely points out that defense counsel objected to the testimony at trial and assumes prejudice as a result of appellate counsel’s failure to raise the issue on direct appeal. The testimony Officer Browning offered was based on his physical observations of the blood tracks and did not require any specialized knowledge or skill. It was therefore not improper, and appellate counsel was not ineffective for failing to raise this meritless issue on appeal. See Walls, 926 So.2d at 1175-76.
Jennings next challenges portions of the testimony of David Grimes, a document and impressions examiner who testified as an expert in the field of footwear and shoe print examination. Defense counsel did not object to Grimes’ qualification as an expert witness. Grimes’ testimony concerned comparisons between crime scene impressions and particular shoes, stating that several impressions “match[ed]” or “corresponded].” Jennings argues that Grimes’ use of these types of descriptive terms and phrases *1125 were subjective and lacked a scientific basis. We disagree.
Grimes was qualified as an expert in the field of shoe print examination and therefore was permitted to testify in the form of an opinion as to his specialized knowledge. § 90.702, Fla. Stat. (1995). Jennings does not cite, and we have not located, any authority for the proposition that an expert witness’s use of terms such as “match” or “correspond” lacks a reasonable basis in science and is improper for a qualified expert to employ. To the extent Jennings alleges that Grimes’ testimony contained legal conclusions, statements that a particular shoe made a particular impression merely represent the kind of opinion an expert specialized in the field of shoe print examination is entitled to, and would be expected to, offer. There was no error in the trial judge’s rulings with respect to trial counsel’s objections to Grimes’ testimony, and appellate counsel therefore cannot be deemed ineffective for failing to raise this meritless issue. See Walls, 926 So.2d at 1175-76.
Lastly, Jennings challenges Corporal Joe Barber’s testimony that the air pistol that law enforcement found in this case was “almost identical” to a “real firearm,” and Corporal Barber’s use of an actual firearm as a demonstrative aid to show the jury the similarity between the two items. Defense counsel objected to Corporal Barber’s demonstration as cumulative, but the trial court overruled the objection and Corporal Barber proceeded to hold the two items up for the jury to observe. In response to a question about which was the “real gun,” Corporal Barber stated that the air pistol “seem[ed] as [if] it’s almost a perfect replica.” Jennings now asserts that appellate counsel was ineffective for failing to challenge Corporal Barber’s testimony on direct appeal. However, Jennings presents no support for his contention that there was error in the trial court’s ruling on this issue or that it would have been a meritorious argument on appeal. Thus, appellate counsel cannot be deemed deficient for failing to raise this meritless issue. See Walls, 926 So.2d at 1175-76.

Alleged State Misconduct

In his second habeas claim of ineffective assistance of appellate counsel, Jennings argues that appellate counsel was deficient for failing to challenge the trial court’s denial of his motion for mistrial based on an incident at trial in which an employee of the State Attorney’s Office provided a cough drop to a member of the jury. This claim is without merit.
“A motion for mistrial should be granted only when the error is deemed so prejudicial that it vitiates the entire trial, depriving the defendant of a fair proceeding. The standard of review applied to motions for mistrial is abuse of discretion.” Floyd v. State, 913 So.2d 564, 576 (Fla.2005) (citation omitted). “A motion for mistrial is properly denied where the matter on which the motion is based is rendered harmless by a curative instruction.” Perez v. State, 919 So.2d 847, 364 (Fla.2005).
In this case, Jennings’ motion for mistrial was based on the allegedly improper conduct of an individual seated at the prosecution’s counsel table who furnished a cough drop to a juror suffering from a coughing spell. Defense counsel brought the matter to the court’s attention, and the trial judge immediately dismissed the jury and inquired into the incident. The trial court admonished the parties involved and emphasized the importance of avoiding the appearance of impropriety, but denied Jennings’ motion for mistrial. The trial court did, however, *1126 provide a curative instruction, informing the jury that the conduct in question was “very inappropriate” and that the jury should “not be influenced in any way by this gesture on the part of the individual who passed whatever it was to you.”
Despite the curative instruction, Jennings argues that appellate counsel should have raised the denial of his motion for mistrial on appeal. Jennings does not allege, however, how the improper conduct may have affected the jury or why the curative instruction was insufficient. Because Jennings has not demonstrated that the trial court erred in denying his motion for mistrial, appellate counsel cannot be deficient for failing to raise the meritless issue on direct appeal. See Walls, 926 So.2d at 1175-76.

Admissibility of Photographs

In his third habeas claim of ineffective assistance of appellate counsel, Jennings argues that appellate counsel was deficient for failing to challenge the admission of several allegedly prejudicial photographs at trial. Because the underlying claim lacks merit, we deny habeas relief.
“This Court has long followed the rule that photographs are admissible if they are relevant and not so shocking in nature as to defeat the value of their relevance.” Hertz v. State, 803 So.2d 629, 641 (Fla.2001) (quoting Czubak v. State, 570 So.2d 925, 928 (Fla.1990)). “The test for admissibility of photographic evidence is relevancy rather than necessity.” Pope v. State, 679 So.2d 710, 713 (Fla.1996). “Crime scene photographs are considered relevant when they establish the manner in which the murder was committed, show the position and location of the victim when he or she is found by police, or assist crime scene technicians in explaining the condition of the crime scene when police arrived.” Douglas v. State, 878 So.2d 1246, 1255 (Fla.2004). This Court has “consistently upheld the admission of allegedly gruesome photographs where they were independently relevant or corroborative of other evidence.” Hertz, 803 So.2d at 641 (quoting Czubak, 570 So.2d at 928). In addition, the Court has stated in particular that “autopsy photographs are relevant to show the manner of death, location of wounds, and identity of the victim, and to assist the medical examiner.” Jones v. Moore, 794 So.2d 579, 587 (Fla.2001).
However, “[t]o be relevant, a photo of a deceased victim must be probative of an issue that is in dispute.” Seibert v. State, 64 So.3d 67, 88 (Fla.2010) (quoting Almeida v. State, 748 So.2d 922, 929 (Fla.1999)) (alteration in original). Furthermore, even relevant photographs must be carefully scrutinized by the trial court to determine whether the “gruesomeness of the portrayal is so inflammatory as to create an undue prejudice in the minds of the jur[ors] and [distract] them from a fair and unimpassioned consideration of the evidence.” Czubak, 570 So.2d at 928 (quoting Leach v. State, 132 So.2d 329, 331-32 (Fla.1961)) (second alteration in original). In other words, the relevancy standard “by no means constitutes a carte blanche for the admission of gruesome photos.” Almeida, 748 So.2d at 929.
Jennings first challenges the admission of photographs, over defense objection, of Jennings and codefendant Graves with exotic dancers sitting on their laps, arguing that the pictures’ probative value in relation to the crime was substantially outweighed by the danger of unfair prejudice. The trial court found that the pictures were relevant to demonstrate that Jennings was not acting afraid of Graves and to show the affluent lifestyle Jennings and Graves were living after the robbery.
We conclude that Jennings has not demonstrated any error in the trial court’s *1127 ruling. Because the photos at issue were relevant, probative of several issues in the case, and “not so shocking in nature as to defeat the value of their relevance,” Hertz, 803 So.2d at 641 (quoting Czubak, 570 So.2d at 928), the trial court did not err in admitting these photographs.
Next, Jennings challenges the admission of crime scene photographs depicting the deceased victims and the bloody surroundings. Jennings claims that appellate counsel should have raised an issue regarding the trial court’s denial of defense objections to these crime scene photographs as cumulative and unduly prejudicial. While depicting a murder scene, the photographs at issue do not appear to be overly gruesome or shocking, and they were used by law enforcement officers in describing how the officers found the victims and other evidence, such as bloody shoe tracks, upon arrival at the restaurant. A reconstruction of the crime scene and the fact that the victims’ hands were tied behind their backs were relevant issues in the case, and the pertinent photographs were probative of those issues. The trial court therefore did not err in admitting these photographs.
Lastly, Jennings challenges the admission of three autopsy photographs admitted during the medical examiner’s testimony. This Court has previously upheld the admission of autopsy photographs when they were relevant to assist the medical examiner’s testimony and to demonstrate premeditation. See, e.g., Philmore v. State, 820 So.2d 919, 932 (Fla.2002). While “trial courts must be cautious in not permitting unduly prejudicial or particularly inflammatory photographs before the jury,” photographs “are admissible ‘to show the manner of death, location of wounds, and the identity of the victim.’” Brooks v. State, 787 So.2d 765, 781 (Fla. 2001) (quoting Larkins v. State, 655 So.2d 95, 98 (Fla.1995)). The three autopsy photographs to which Jennings objects show the neck wounds suffered by each victim in this case and were therefore relevant to the medical examiner’s testimony and properly admitted.
Accordingly, we deny habeas relief on this claim.

Trial Judge’s Comment

In his fourth habeas claim of ineffective assistance of appellate counsel, Jennings argues that appellate counsel was deficient for failing to raise on appeal the trial judge’s characterization of the case during pretrial jury selection as “the infamous Cracker Barrel case.” Jennings’ trial counsel did not contemporaneously object to this comment, so the issue was not preserved for appellate review. Accordingly, Jennings must demonstrate that the underlying claim constituted fundamental error. See Power v. State, 886 So.2d 952, 963 (Fla.2004). “Fundamental error is the type of error which reaches down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error.” Id. Because Jennings cannot meet this high burden on the alleged facts, we deny habeas relief on this claim.
A review of the context surrounding the remark reveals that, at the time it was uttered, the judge was trying to aid a potential juror in remembering whether the venireperson had heard anything about the case or formed any fixed opinion. In fact, the record clearly displays that the judge was in actuality attempting to determine the potential juror’s familiarity with the facts of the case for the very purpose of ascertaining the presence of potential bias. Jennings does not raise any specific challenge to jury selection or composition, or allege impermissible pretrial publicity, but instead relies on a general allegation *1128 that the judge’s reference to the case as “infamous” tainted the entire proceeding from the start. This argument is unavailing and falls short of the required showing needed to demonstrate fundamental error. We therefore deny habeas relief on this claim.

Rule Regarding Juror Interviews

In his final habeas claim of ineffective assistance of appellate counsel, Jennings contends that appellate counsel was deficient for failing to assert that Rule Regulating the Florida Bar 4 — 3.5(d)(4), which imposes restrictions on post-trial juror interviews by lawyers, violates his constitutional rights. Although Jennings refers to two events that he alleges may have biased jurors, Jennings asserts only that appellate counsel was deficient because he failed to bring a constitutional challenge to the rule.
The underlying issue was not preserved for review. Moreover, this Court has on numerous occasions rejected similar constitutional challenges to rule 4-3.5(d)(4). See, e.g., Floyd v. State, 18 So.3d 432, 459 (Fla.2009) (rejecting claim that rule 4 — 8.5(d)(4) violated due process rights as well as the First, Sixth, Eighth, and Fourteenth Amendments); Israel v. State, 985 So.2d 510, 522 (Fla.2008) (rejecting claim that rale 4-3.5(d)(4) violates constitutional rights of due process and equal protection); Power, 886 So.2d at 957 (rejecting contention that rale 4-3.5(d)(4) violated appellant’s right of access to courts under article I, section 21, of the Florida Constitution). In addition, “where the defendant merely complains about the ‘inability to conduct “fishing expedition” interviews,’ the claim is without merit.” Evans v. State, 995 So.2d 933, 952 (Fla.2008) (quoting Johnson v. State, 804 So.2d 1218, 1225 (Fla.2001)).
Accordingly, appellate counsel cannot be deemed deficient for failing to raise a non-meritorious issue on direct appeal. See Farina v. State, 937 So.2d 612, 626 (Fla.2006) (holding as meritless defendant’s claim that appellate counsel was ineffective for failing to challenge rale 4-3.5(d)(4) as unconstitutional).
CONCLUSION
Based on the foregoing, we affirm the postconviction court’s denial of relief, and we also deny Jennings’ habeas petition.
It is so ordered.
PARIENTE, QUINCE, CANADY, LABARGA, and PERRY, JJ., concur.
POLSTON, C.J., and LEWIS, J., concur in result.

. Because Jennings initially filed his motion for postconviction relief before October 1, 2001, his claims are governed by Florida Rule of Criminal Procedure 3.850, rather than rule 3.851. See Rodriguez v. State, 39 So.3d 275, 282 n. 4 (Fla.2010).

. Jennings raised four claims on direct appeal, all of which the Court rejected: (1) the trial court erred in denying his motion to suppress statements he made to Florida law enforcement while in custody in Las Vegas; (2) the trial court erred in finding the avoid arrest aggravator; (3) the trial court erred in finding CCP; and (4) Jennings’ death sentences were impermissibly disparate from co-defendant Graves’ sentences of life imprisonment. Id. at 147-53. The Court did not address Jennings’ challenge to his robbery sentence because it was not preserved below. See id. at 145 n. 1.

. Jennings’ twenty-five claims were as follows: (1) Jennings' convictions are materially unreliable due to the cumulative effects of the following: (a) trial counsel’s failure to investigate the circumstances surrounding Jennings' confession, depose or prepare for cross-examination of several State witnesses, investigate the crime scene and consult forensic experts, and object to prosecutorial misconduct; (b) improper rulings of the trial court; and (c) the withholding of exculpatory evidence; (2) trial counsel was ineffective for failing to object to prosecutorial misconduct, including the State making inconsistent arguments at Jennings’ and codefendant Graves’ trials; (3) trial counsel was ineffective for failing to obtain an adequate mental health evaluation of Jennings and for failing to provide the necessary background information to the mental health experts in order to present critical information to the jury regarding Jennings' mental state at the guilt, penalty, and sentencing phases of Jennings' trial; (4) trial counsel was ineffective for failing to investigate, prepare, and present mitigation evidence and for failing to adequately challenge the aggravating circumstances presented to the jury; (5) trial counsel was ineffective for failing to conduct adequate voir dire and for failing to *1111 request a curative instruction after the trial judge introduced the case to potential jurors as the "infamous Cracker Barrel case”; (6) trial counsel was ineffective for failing to establish that Jennings was not competent to waive his Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), rights and for failing to object to the admission of Jennings’ statements on the ground that they were obtained by the use of threats, promises, and misleading information; (7) Jennings is entitled to a new trial as a result of newly discovered evidence regarding weaknesses in the field of forensic sciences; (8) there were insufficient aggravating factors to render Jennings eligible for the death penalty, the jury was given unconstitutionally vague instructions on the aggravators, and newly discovered mitigation evidence renders Jennings’ death sentences disproportionate; (9) the penalty phase instructions were improper and trial counsel was ineffective for failing to object to the instructions; (10) the State failed to prove the avoid arrest aggravator, which is unconstitutionally vague, and trial counsel was ineffective for failing to raise this issue; (11) the jury instruction on expert witness testimony was deficient and trial counsel was ineffective for failing to object; (12) the “during the commission of a felony” aggravator is unconstitutionally vague and overbroad, and trial and appellate counsel failed to properly litigate this issue; (13) the trial court relied on nonstatutory aggravating factors in sentencing Jennings to death, and trial counsel was ineffective for failing to object; (14) the trial court improperly instructed the jury regarding its role in the penalty phase in violation of Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), and trial counsel was ineffective for failing to litigate this issue; (15) rule 4-3.5(d)(4) of the Rules Regulating the Florida Bar is unconstitutional because it prohibits defense counsel from interviewing jurors to determine if constitutional error was present in Jennings’ case; (16) the jury was not adequately instructed regarding the aggravating factors, and section 921.141, Florida Statutes (2009), is unconstitutionally vague and overbroad; (17) Florida's capital sentencing statute is unconstitutional, and trial and appellate counsel failed to properly litigate this issue; (18) Jennings was denied a fair trial due to pretrial publicity, and trial counsel was ineffective for failing to research local media coverage of the case in Pinellas County, where it was tried, and for failing to request that the trial be conducted outside the influence of the Collier County press; (19) the trial court improperly considered inadmissible victim impact evidence, and trial and appellate counsel failed to properly litigate this issue; (20) the sentencing order did not reflect independent weighing or reasoned judgment, and trial counsel was ineffective for failing to litigate this issue; (21) the aggravating circumstance of commission during the course of an enumerated felony is unconstitutional, and trial and appellate counsel were ineffective for failing to litigate this issue; (22) cumulative errors entitle Jennings to relief; (23) Jennings was denied a proper direct appeal due to omissions in the record, and trial counsel was ineffective for failing to ensure that a proper record was provided to the court; (24) Jennings is insane and cannot be executed; and (25) lethal injection constitutes cruel and unusual punishment, the Department of Corrections unconstitutionally delegated its authority to create and implement lethal injection procedures to the Attorney General’s Office, and denial of appointed counsel to raise a federal civil rights action violates the Equal Protection Clause.

. Huff v. State, 622 So.2d 982 (Fla.1993).

. Cheney’s name was misspelled in the trial transcript as Angela Chainey.

. The State did not present any witnesses at the evidentiary hearing.