NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT


GARY ANTHONY PENTON, )
)
    Appellant, )
)
v. )    Case No. 2D17-3765
)
STATE OF FLORIDA )
)
    Appellee. )
_____)

Opinion filed December 28, 2018.

Appeal pursuant to Fla. R. App. P.
9.141(b)(2) from the Circuit Court for Pasco
County; Kim Campbell, Judge.

Gary Penton, pro se.


SILBERMAN, Judge.

        Gary Penton appeals the summary denial of his motion for postconviction

relief filed under Florida Rule of Criminal Procedure 3.850. We affirm the denial of

claims two(a), two(b), and four without comment, but we reverse the denial of claims

one and three and remand for further consideration of those claims.

        Penton was convicted of one count of robbery after Penton's roommates,

Mike and Billy, robbed a passenger who was waiting in Penton's stranded vehicle while

Penton was walking to a gas station to obtain gas. Following the robbery, Penton gave three statements to law enforcement. He gave his first statement at the scene of the robbery to a responding deputy. According to the deputy's trial testimony, Penton said that he had given the victim, George Ray Flagg, a ride to the dollar store and the bank. Penton started running out of gas so he turned off the road, circled through a parking lot, and began driving to a Circle K that they had just passed. The truck then ran out of gas, so Penton retrieved a gas can from the rear of the truck and walked to the Circle K. When Penton returned, he saw Flagg standing in the road on the phone with 911. Flagg said that he had been robbed. According to the deputy, Penton "said that he didn't see the incident or didn't know who it was." The deputy testified that Penton did not mention his roommates in any way.

About one month later, after the girlfriend of one of the roommates was caught using one of Flagg's credit cards, a detective went to Penton's house to interview him further. Penton gave an oral statement that was then reduced to writing. In the written statement, which was read aloud at trial, Penton explained that he picked up Flagg with the intention of taking him to Flagg's son's house and to look at a job for Penton's tree business. Flagg instructed Penton to go to his son's house first and told him that they would look at the job afterwards. Penton called Mike and Billy, who planned on meeting him to look at the potential job, and told them that he needed to take Flagg to Flagg's son's house and to go shopping. During the trip, Mike and Billy kept calling to find out what was taking so long. Penton updated them and told them that Flagg also wanted to stop by the bank.

After Flagg's errands were complete, Penton called Mike and Billy and told them to meet him at Publix so that they could follow him to take a look at the potential job. Mike and Billy asked Penton how much money Flagg had gotten from the bank, and Penton told them that he did not know. Penton said that as he passed Publix "[Mike and Billy] called us," but his statement did not provide the contents of the conversation or indicate whether he had answered that call. Penton continued, saying, "I ran out of gas at the parts store and they went up to him and robbed him." Penton concluded the statement by saying that later that day Mike and Billy were high on meth and were mad at him because they did not get enough money.

At trial, in addition to describing the sequence of events and Penton's statements, the detective testified that Penton orally told him that, based on his phone conversations with Mike and Billy, Penton assumed that they wanted to take Flagg's money as he had told them that he took Flagg to the bank, but "he didn't have direct knowledge at that point."

The detective later arrested Penton and took another written statement. The statement was largely consistent with the previous written statement, with some additional details:

> I was living with Mikey Gaber and working [with] him and Jason[.] They and Billy kept wanting me to drive them to [steal] things they saw while working with me. The day the robbery happened Mikey and Billy [were] high on meth[.] Mr. Ray [Flagg] called me to do some work around his house [and] give him a ride to take his son some money[.] I told Mikey and Billy we could make some money doing some work around Ray's house[,] [but] first I had to take him to his son. While I was doing that they kept calling wanting to

- 3 -

know where I was and when I would be back[.] I talk[ed] to them several time[s] and [told] them we had to stop by the bank[.] They wanted to know how much [money] he got[.] I told them I don't know, he keep[s] [money] all the time for his son. They said something about robbing his old ass but I didn't think they were going to do it[.] On the way back to Ray they wanted me to stop somewhere so they [could] rob him[.] They [told] me to stop at Publix or [Circle K][.] I didn't but I ran out of gas passing the parts house[.] I tried to turn around and make [it] back to [the] [Circle K] but could not. While I was gone to get gas Mikey and Billy robbed him and left. When I got back Mr. Ray was by the road on the phone with the Sheriff [Department]. We gave our statement and left[.] I went and pick[ed] up my wife from work[.] When I got home Jason and Jamie told me Mikey and Billy had come by with a generator and [had] gone to sell it. Later that night Mikey and Billy came back mad because they only got $60–70. They told me Mikey drove and Billy robbed Mr. Ray.

The detective testified that at the time of the second written statement Penton verbally told him that "before he went to Mr. Ray, what he called Mr. Ray, he knew then that they were going to try to rob him." When asked how that statement differed from Penton's February statement, the detective asserted that "this time he said that he was aware that they were trying to make him steal things . . . . He didn't take ownership of it the first time that he had knowledge that they were going to rob him before it started. The second statement he had knowledge before they ever left."

We review the summary denial of a rule 3.850 motion de novo and "must accept the movant's factual allegations as true to the extent that they are not refuted by the record." Jennings v. State, 123 So. 3d 1101, 1121 (Fla. 2013). "[W]e must examine each claim to determine if it is legally sufficient, and, if so, whether the record refutes it." Allen v. State, 854 So. 2d 1255, 1258 (Fla. 2003). A defendant must establish each

- 4 -

claim by alleging specific facts. Id. at 1259. "[U]nless the record shows conclusively that the appellant is entitled to no relief, the order shall be reversed and the cause remanded for an evidentiary hearing or other appropriate relief." Fla. R. App. P. 9.141(b)(2)(D).

For each asserted claim of ineffective assistance of trial counsel, a defendant must show (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced him. Strickland v. Washington, 466 U.S. 668, 687 (1984). The defendant must overcome a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689. Moreover, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

In his first claim for postconviction relief, Penton asserted that counsel provided ineffective assistance by advising him not to testify. Penton stated that his testimony was necessary to refute the detective's testimony that he had prior knowledge of the robbery. Penton averred that the detective mischaracterized his statements as to his knowledge of a robbery plan and that he never made that statement. Regarding deficient performance, Penton alleged that counsel advised him not to testify because the State would be able to inquire into "every detail" of Penton's criminal history on cross-examination, including Penton's prior convictions for drug possession and burglary, his probation violations, his prior DWI, and his drug and alcohol counseling

history. Penton claimed that he told counsel during the detective's testimony that the detective was misrepresenting his statements and that he needed to testify to clarify his story, especially in light of defense counsel's decision to not cross-examine the detective. According to Penton, counsel told him that if he testified his past "would kill [him]." As a result, Penton stated that he acquiesced to counsel's advice and agreed to waive his right to testify.

Penton's allegation that counsel told him that the State would be able to impeach him with "every detail" of his convictions was sufficient to show deficient performance. See Tyler v. State, 793 So. 2d 137, 141 (Fla. 2d DCA 2001) ("Where counsel incorrectly informs a defendant regarding the use of prior convictions as impeachment, specifically, that upon testifying the jury will hear the specific nature of the prior convictions, and the defendant shows that because of the misinformation he did not testify, he has satisfied the deficient performance prong of an ineffective assistance of counsel claim." (emphasis added)); Everhart v. State, 773 So. 2d 78, 79–80 (Fla. 2d DCA 2000) (holding that the defendant sufficiently alleged deficient performance when he asserted that counsel informed him that the jury would be told of "the specific nature of his prior convictions" if he testified).

As to prejudice, Penton alleged that he would have testified about several points that would have helped his case, including that Flagg was both a friend and a good client of his tree business; that he was negotiating a $1000 contract with Flagg and therefore had an interest in maintaining a good relationship with him; that prior to the trip Flagg did not mention going to the bank so Penton would not have had a basis

- 6 -

to plan a robbery; and that he knew that after going to the bank Flagg had placed several hundred dollars in his pants pocket rather than his wallet, something that the robbers were apparently unaware of and something that he presumably would have relayed to the robbers if he were involved. Penton further alleged that he would have testified that he never told the detective that he knew before the trip that Mike and Billy planned to rob Flagg.

The postconviction court denied relief as to this claim, citing to Penton's statements to law enforcement and the detective's trial testimony. The court concluded that Penton could not establish prejudice because he had claimed that he did not know about the robbery beforehand and then stated that he did not take Mike and Billy's statement about robbing the victim seriously. The court added that Penton's statements and his proposed trial testimony were contradictory and, taken together with the sequence of events as described in Penton's statements, his trial testimony would not be believed by a jury.

We cannot agree with the postconviction court's analysis. Penton's first statement indicated he did not know who committed the robbery. In a later statement, Penton acknowledged receiving a call while he was driving with Flagg, during which Mike and Billy "said something about robbing his old ass" but he did not think they would do so. He explained in his motion why he did not believe Mike and Billy were serious, saying that he had "actually laughed at that" and "attributed [their statement] to their state of inebriation." Further, he would have pointed out the inaccuracies, assumptions, and inferences in the detective's trial testimony and would have testified

- 7 -

that he never said that he knew in advance that Flagg would be robbed or that he had been involved in planning the robbery. While it is possible that a jury may disbelieve Penton, based on the record before us we cannot agree that Penton's claim was refuted by the record. See Tyler, 793 So. 2d at 142 (concluding that the defendant sufficiently demonstrated prejudice when he alleged that he would have refuted a witness' claim that he had confessed to the crime and would have testified that he was not involved in the crime and was instead an unintended victim); Everhart, 773 So. 2d at 79 (holding that the defendant sufficiently demonstrated prejudice by alleging that his testimony would have refuted a police officer's testimony and explained that the officer mischaracterized his statements, which would have turned the resolution of his defense into a credibility determination).

In his third claim for relief, Penton asserted that counsel provided ineffective assistance by failing to interview Mike and Billy and by failing to call them to testify at trial. Specifically, Penton alleged,

> as he had stated to counsel on several occasions, [that he] had spoken to each witness prior to his arrest[,] knew [their] whereabouts, and had been assured, and was confident in their assurances, that they would tell the jury the truth in that [he] had no part in the participation, planning[,] or execution of the robbery and knew nothing of it until later that evening.

The postconviction court rejected this claim, stating that it was unreasonable to believe that the codefendants, Mike and Billy, would have implicated themselves in committing an armed robbery and subjected themselves to conviction as codefendants. The court added that even if they had so testified, it was unlikely that the

jury would have believed them in light of Penton's statements to law enforcement.

As with claim one, we reverse because Penton's claim is facially sufficient and the record does not conclusively refute the claim. First, while Mike and Billy might have refused to testify favorably for Penton, that assumption is simply not conclusively established based on the limited record that has been provided to us. See Neal v. State, 854 So. 2d 666, 669–70 (Fla. 2d DCA 2003) (concluding that a defendant's allegation that a co-defendant was willing to provide exculpatory testimony on the defendant's behalf, and that the co-defendant would have acknowledged facts implicating the co-defendant, presented a facially sufficient claim of ineffective assistance for failure to call a witness). Second, had Mike and Billy so testified, we cannot agree that no reasonable jury would have accepted such testimony. Our conclusion is buttressed by our determination that Penton's first claim was not conclusively refuted by the record.

For these reasons, we reverse and remand for further proceedings on claims one and three.

Affirmed in part, reversed in part, and remanded for further proceedings.


CRENSHAW and LUCAS, JJ., concur.