[PUBLISH]

In the

# United States Court of Appeals

For the Eleventh Circuit

_____

No. 21-11591

_____

BRANDY BAIN JENNINGS,

Petitioner-Appellant,

*versus*

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 2:13-cv-00751-SPC-MRM

_____

Before JORDAN, BRANCH, and BRASHER, Circuit Judges.

BRANCH, Circuit Judge:

Brandy Bain Jennings is a Florida prisoner serving three death sentences for the 1995 murders of Dorothy Siddle, Vicki Smith, and Jason Wiggins during a robbery at the Cracker Barrel where Jennings formerly worked.[1]  After pursuing a direct appeal and postconviction relief in the Florida state courts, Jennings filed a federal habeas petition under 28 U.S.C. § 2254, alleging, in relevant part, that his counsel rendered constitutionally ineffective assistance during the penalty phase.  After the district court denied Jennings's § 2254 petition on the merits, we granted a certificate of appealability ("COA") on one issue: "Whether the district court erred in denying Jennings's claim that his trial counsel rendered ineffective assistance in the penalty phase of his capital trial by failing to conduct further investigation into Jennings's childhood and background."

After review and with the benefit of oral argument, we conclude that the Florida Supreme Court's decision that Jennings failed to establish prejudice was not contrary to, or an unreasonable application of, clearly established federal law, and we affirm on that ground.

---

[1] Jennings is also serving 15 years' imprisonment for the robbery.

## I.    Background

### A.  Guilt Phase of the Trial

In 1995, a Florida grand jury indicted Jennings and codefendant Jason Graves with three counts of premeditated murder and one count of robbery.[2]  Public Defenders Tom Osteen and Adam Sapenoff were appointed to represent Jennings.  The trial took place in October 1996.  The Florida Supreme Court summarized the facts of this case as follows:

> Dorothy Siddle, Vicki Smith, and Jason Wiggins, all of whom worked at the Cracker Barrel Restaurant in Naples, were killed during an early morning robbery of the restaurant on November 15, 1995.  Upon arriving on the scene, police found the bodies of all three victims lying in pools of blood on the freezer floor with their throats slashed.  Victim Siddle's hands were bound behind her back with electrical tape; Smith and Wiggins both had electrical tape around their respective left wrists, but the tape appeared to have come loose from their right wrists.

> Police also found bloody shoe prints leading from the freezer, through the kitchen, and into the office,

---

[2] Graves was 18 years' old at the time of the crimes, and the State agreed to waive the death penalty in Graves's case in exchange for his waiver of a motion for a continuance to allow him more time to prepare for a capital trial.  Graves was convicted on all charges in a separate proceeding and sentenced to the only available sentence—life imprisonment.

blood spots in and around the kitchen sink, and an opened office safe surrounded by plastic containers and cash. Outside, leading away from the back of the restaurant, police found scattered bills and coins, shoe tracks, a Buck knife, a Buck knife case, a pair of blood-stained gloves, and a Daisy air pistol.

Jennings (age twenty-six) and Jason Graves (age eighteen), both of whom had previously worked at the Cracker Barrel and knew the victims, were apprehended and jailed approximately three weeks later in Las Vegas, Nevada, where Jennings ultimately made lengthy statements to Florida law enforcement personnel. In a taped interview, Jennings blamed the murders on Graves, but admitted his (Jennings') involvement in planning and, after several aborted attempts, actually perpetrating the robbery with Graves. Jennings acknowledged wearing gloves during the robbery and using his Buck knife in taping the victims' hands, but claimed that, after doing so, he must have set the Buck knife down somewhere and did not remember seeing it again. Jennings further stated that he saw the dead bodies in the freezer and that his foot slipped in some blood, but that he did not remember falling, getting blood on his clothes or hands, or washing his hands in the kitchen sink. Jennings also stated that the Daisy air pistol belonged to Graves, and directed police to a canal where he and Graves had thrown other evidence of the crime.

In an untaped interview the next day, during which he was confronted with inconsistencies in his story and the evidence against him, Jennings stated, "I think I could have been the killer. In my mind I think I could have killed them, but in my heart I don't think I could have."

At trial, the taped interview was played for the jury, and one of the officers testified regarding Jennings' untaped statements made the next day. The items ultimately recovered from the canal were also entered into evidence.

The medical examiner, who performed autopsies on the victims, testified that they died from "sharp force injuries" to the neck caused by "a sharp-bladed instrument with a very strong blade," like the Buck knife found at the crime scene. A forensic serologist testified that traces of blood were found on the Buck knife, the Buck knife case, the area around the sink, and one of the gloves recovered from the crime scene, but in an amount insufficient for further analysis. An impressions expert testified that Jennings' tennis shoes recovered from the canal matched the bloody shoe prints inside the restaurant as well as some of the shoe prints from the outside tracks leading away from the restaurant.

. . .

The State also presented testimony concerning previous statements made by Jennings regarding his

dislike of victim Siddle.  Specifically, Bob Evans, one of the managers at Cracker Barrel, testified that Jennings perceived Siddle to be holding him back at work and that, just after Jennings quit, he said about Siddle, "I hate her.  I even hate the sound of her voice."  Donna Howell, who also worked at Cracker Barrel, similarly testified that she was aware of Jennings' animosity and dislike of Siddle, and that Jennings had once said about Siddle, "I can't stand the bitch.  I can't stand the sound of her voice."

The jury found Jennings guilty as charged.

*Jennings v. State*, 718 So. 2d 144, 145–47 (Fla. 1998) (footnotes omitted).

## B.  The Penalty Phase

Following the jury's guilty verdict, Jennings's penalty phase proceeded the very next day.  The trial court instructed the jury that its sentencing determination was an advisory recommendation and that "[t]he final decision as to what punishment shall be imposed rests solely with the judge."[3]  The

---

[3] At the time of Jennings's trial, the jury's sentencing determination was advisory and required only a majority vote, but the trial court was required to place "great weight" upon the recommendation of the jury.  *See* Fla. Stat. § 921.141(2) (1996); *Tedder v. State*, 322 So. 2d 908, 910 (Fla. 1975) (holding that jury recommendation "should be given great weight"), *abrogated by Hurst v. Florida*, 577 U.S. 92 (2016).  A vote of six or more jurors was necessary for a recommendation of life imprisonment.  *State v. Steele*, 921 So. 2d 538, 545 (Fla. 2005), *abrogated by Hurst*, 577 U.S. at 92; *see also Reynolds v. State*, 251 So. 3d 811, 827 (Fla. 2018) (explaining that under Florida's former capital

trial court further instructed that under Florida law, it was "required to give great weight and deference" to the jury's recommendation.

Jennings called six witnesses during the penalty phase—Michael Lobdell, Angela Lobdell, Brian McBride, Rebecca Lloyd, Mary Hamler, and his mother Tawny Jennings. These witnesses all testified very positively to Jennings's character, collectively stating that Jennings was a good friend to everyone, a good son, "happy-go-lucky," "easy going," "fun-loving," wonderful with children, and not a troublemaker.

On cross-examination, the State elicited testimony from Angela and Michael Lobdell that Jennings came to their home the day after the murder, and he was not acting any differently. Additionally, McBride testified that the day before the robbery, Jennings told McBride that he was working at a mall on a construction job and that he was getting paid the next day and

---

sentencing scheme, a jury "had various options for recommendations, including life, 7–to–5 death, 8–to–4 death, 9–to–3 death, 10–to–2 death, 11–to–1 death, and unanimous death outcomes").

Florida has since amended its capital sentencing scheme and now requires that, in order for the jury to recommend a death sentence, the jury must unanimously find the existence of at least one aggravating factor and unanimously agree that the defendant should be sentenced to death. Fla. Stat. § 921.141(2) (2021). However, the jury's recommendation that the defendant be sentenced to death is still advisory, and the trial court may override the recommendation. *Id.* § 921.141(3).

would be heading to California.

Hamler—who was in a relationship with Jennings for a couple of years—testified on cross-examination that one time when they were watching a news broadcast about a robbery, Jennings stated that he "wouldn't be stupid enough to stick around" and that he "would go north." She also stated that Jennings was very angry with Cracker Barrel because it had told him to cut off his ponytail if he wanted "to advance himself," and his ponytail was part of his Indian heritage. She confirmed that Jennings cut his ponytail off and had a grudge against Cracker Barrel because he was not promoted. Jennings held victim Dorothy Siddle particularly responsible, and told Hamler "[o]ne day [Siddle] would get hers."[4]

Lastly, Tawny Jennings, Jennings's mother, testified to Jennings's background and the close relationship she shared with her son. Specifically, she testified that Jennings's father was a Sioux Indian, and she divorced him while she was pregnant with Jennings. Jennings never met his father. Jennings was her only

---

[4] Siddle was an associate manager at the Cracker Barrel restaurant. During the guilt phase of the trial, another associate manager testified that Jennings, who was a grill cook, wanted to cross-train to become a server, but management told him that he had some areas he needed to improve first, including his "basic appearance, clothes, . . . [his] big long ponytail, . . . and also his attitude." It is unclear from the record whether Siddle was the associate manager tasked with relaying this information to Jennings, but as a scheduling manager, she would have been the person to schedule the desired cross-training.

21-11591                Opinion of the Court                9

living child.[5]  She and Jennings moved a lot.  They lived in Oregon for the first nine years of Jennings's life, then they moved to Colorado (for about a year and a half), moved back to Oregon (for six months), then moved to Wyoming (for a year), then moved back to Oregon (for a year), then Arizona, and finally Florida when Jennings was about 14 or 15 years' old.  Tawny was a single mom all of Jennings's childhood, and she occasionally had "a male companion" that lived with them.  According to Tawny, Jennings was a straight-A student in school, but he had to quit high school at 17 because Tawny became very ill, and he needed to care for her.  Tawny explained that she and Jennings were "very close" like "best friends," and that she could not have asked for a better son.

In closing, the State argued that it had established three statutory aggravating factors:[6]  (1)  that  the  murders  were

---

[5] Tawny had twins that died of crib death before Jennings was born.

[6] At the time of Jennings's trial, Florida law defined aggravating circumstances as the following:

> (a) The capital felony was committed by a person under sentence of imprisonment or placed on community control.
>
> (b) The defendant was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person.
>
> (c) The defendant knowingly created a great risk of death to many persons.
>
> (d) The capital felony was committed while the defendant was engaged, or was an accomplice, in the commission of, or an

committed while Jennings engaged in or was an accomplice in the commission of the crime of robbery;[7] (2) the murders were

---

attempt to commit, or flight after committing or attempting to commit, any robbery . . . .

(e) The capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody.

(f) The capital felony was committed for pecuniary gain.

(g) The capital felony was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws.

(h) The capital felony was especially heinous, atrocious, or cruel.

(i) The capital felony was a homicide and was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification.

(j) The victim of the capital felony was a law enforcement officer engaged in the performance of his official duties.

(k) The victim of the capital felony was an elected or appointed public official engaged in the performance of his official duties if the motive for the capital felony was related, in whole or in part, to the victim's official capacity.

(l) The victim of the capital felony was a person less than 12 years of age.

Fla. Stat. § 921.141(5) (1996).

[7] In support of this aggravator, the State emphasized that the bloody shoe prints in the restaurant led from the freezer where the victims were to the office where the money was located.

committed for the purpose of avoiding or preventing a lawful arrest;[8] and (3) the murders were committed in a cold, calculated, and premeditated manner.[9]

In response, Jennings's counsel argued that the second and third aggravator did not apply. Jennings's counsel also argued that the State's contention that Jennings wanted to get revenge against Siddle because Jennings cut off his ponytail but then did not get the promotion was "a red herring" because Jennings and Graves did not know who the manager would be the morning of the robbery.

---

[8] In support of the second aggravator, the State emphasized that Jennings and Graves wore gloves so as to not leave identifying fingerprints. The State pointed out that they had masks with them in the truck, and Jennings admitted in a statement to law enforcement that the initial plan had been to wear masks and snatch the money. The State argued that they chose not to wear the masks because they knew there was no reason to wear masks if they were going to eliminate the witnesses. The State also pointed to the testimony from the guilt phase that Jennings stated that if he ever committed a robbery, he would not leave any witnesses.

[9] In support of this third aggravator, the State argued that Jennings carried the knife and killed the victims in a very personal way, one by one. The State also emphasized that there was evidence of calculated premeditation, including that Jennings attempted to set up an alibi; he and Graves brought tape with them to bind the victims; they wore gloves; they hid the truck; they registered in a hotel both before and after the crime using their own names (which demonstrated that they were not concerned with being linked to the crime because they knew they were not leaving any witnesses); and the day after Jennings went to a friend's house and was not acting any different.

Finally, counsel argued that there were several mitigating factors in Jennings's life—"[h]is mother moved him about the country when he was young, quite a bit"; "[h]e never received a proper education"; "[h]e never knew his father" and "never had a continuous father image in his home"; he was an only child without any siblings to lean on; "[h]e had a succession of boyfriends of his mother's who lived in the home from time to time"; he loved his mother and quit school to help her when she got sick; Jennings worked and contributed positively to society; and he had friends and people liked him.  Counsel also reminded the jury that Graves would receive a life sentence for the same offenses and begged the jury to "show mercy" on Jennings.

The jury deliberated approximately an hour and a half and returned a 10 to 2 recommendation in favor of the death penalty for each of the three murder counts.

At the separate sentencing hearing, the trial court addressed the aggravating and mitigating circumstances.  First, the trial court found the existence of the three aggravating factors proffered by the State.  Second, the trial court found one statutory mitigating factor—Jennings had no significant prior criminal history, which it gave some weight.[10]  Third, the trial court found the following

---

[10] Florida law provided for the following statutory mitigating circumstances:

> (a) The defendant has no significant history of prior criminal activity.

21-11591                Opinion of the Court                13

non-statutory mitigating circumstances: (1) Jennings had a "deprived childhood"—he never knew his father, his father abandoned his mother, his mother moved around frequently during his childhood years and had several boyfriends (given some weight); (2) Jennings's codefendant received life imprisonment for the same crimes based on the same evidence (given some weight); (3) Jennings cooperated with law enforcement and made a voluntary statement that led officers to various items of evidence

---

(b) The capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance.

(c) The victim was a participant in the defendant's conduct or consented to the act.

(d) The defendant was an accomplice in the capital felony committed by another person and his participation was relatively minor.

(e) The defendant acted under extreme duress or under the substantial domination of another person.

(f) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.

(g) The age of the defendant at the time of the crime.

Fla. Stat. § 921.141(6) (1996). Jennings argued for three statutory mitigating circumstances: (1) he had "no significant history of prior criminal activity"; (2) he was an accomplice in the offense and his participation was relatively minor; and (3) Jennings acted under "extreme duress or under the substantial domination of another person." *See* Fla. Stat. § 921.141(6)(a), (b), and (e) (1996). The trial court found that the second and third statutory mitigators Jennings argued for did not exist.

(given substantial weight); (4) Jennings had a regular, steady employment history (given little weight); (5) Jennings had a close, loving relationship with his mother (given little weight); (6) Jennings had "[p]ositive personality traits enabling the formation of strong, caring relationships with peers" (given some weight); (7) Jennings had a "[c]apacity to care for and be mutually loved by children" (given some weight); and (8) Jennings exhibited "exemplary courtroom behavior" during the proceedings (given little weight).

The trial court found that "the aggravating circumstances . . . substantially outweigh[ed] the mitigating circumstances present" and that death was the appropriate sentence. Accordingly, the trial court imposed a sentence of death for each of the three murder counts and 15 years' imprisonment for the robbery count.

On direct appeal, the Florida Supreme Court affirmed Jennings's convictions and sentences, and the United States Supreme Court denied certiorari. *Jennings*, 718 So. 2d at 144, *cert. denied*, 527 U.S. 1042 (1999).[11]

---

[11] The Florida Supreme Court rejected Jennings's argument that the evidence was insufficient to support the avoid arrest aggravator and the cold, calculated, and premeditated aggravator. *Jennings*, 718 So. 2d at 150–53.

### C. State Postconviction Proceedings

Thereafter, Jennings, through counsel, filed a state postconviction motion to vacate his judgment of conviction and sentence, under Florida Rule of Criminal Procedure 3.850 and 3.851, followed by several amended motions.  In relevant part, he argued in two related claims that his counsel rendered constitutionally ineffective assistance when he failed to adequately investigate, prepare, and present mitigation at the penalty phase, including failing to adequately investigate his background and childhood, which he alleged contained a wealth of mitigation evidence, and failed to provide background information to the mental health experts that evaluated him prior to trial.  The state postconviction court ordered an evidentiary hearing on his claims, at which Jennings presented several witnesses.

### i.    Evidentiary Hearing Testimony

As relevant to this appeal, Jennings's trial counsel, Thomas Osteen, who had extensive capital case experience at the time he represented Jennings,[12] testified that an investigator, a court-appointed psychiatrist, Dr. Robert Wald, and a court-appointed

---

[12] Osteen testified that he retired in 2000, but he had been an assistant public defender for 30 years, and he had represented approximately 30 capital defendants prior to representing Jennings in 1996.  Osteen also testified that co-counsel Adam Sapenoff did not play any role in the penalty phase other than being present.

psychologist, Dr. Russell Masterson, assisted him with preparation for Jennings's trial and the penalty phase.[13]

Dr. Masterson conducted various tests on Jennings and the results were all within normal limits. Dr. Masterson opined that Jennings had superior intelligence, and his testing results revealed no evidence of "psychotic process," but "suggest[ed] the personality disorder, characterological disorder, sociopathic type of personality."

With regard to Jennings's background, Dr. Masterson noted the following in his report: (1) Jennings and his mother moved around Colorado, Wyoming, Oregon, and Arizona during his childhood; (2) his mother had multiple relationships; (3) Jennings never met his father; (4) Jennings reported being a straight-A student, with no behavior problems; (5) Jennings "always had lots of friends" and described his childhood as "pretty normal" and "a

---

[13] Osteen utilized the Public Defender's Office's Investigator, Ed Neary, who was a retired police investigator and assisted Osteen in "just about all of [his] capital cases." Although Neary did not have any formal mental health training or expertise, Osteen believed that Neary had "a good feel" for those types of issues. Osteen also testified that he worked regularly with both Dr. Wald and Dr. Masterson in other cases, and that they "knew what [he] was looking for."

Osteen did not seek assistance from a mitigation expert, which he explained were "not prevalent" at the time of the trial. Instead, he relied on what he learned from Dr. Wald and Dr. Masterson. Osteen did not attempt to obtain school records, employment records, or medical records, and he did not attempt to interview any of Jennings's relatives other than Jennings's mother.

pretty good first 15 years"; (6) Jennings became sexually active at age 12 when he was seduced by an older woman he babysat for, but he indicated his "first sexual experiences" were at age 5 or 6 with a female cousin who was age 10; (7) Jennings denied any history of sexual abuse from adults; (8) at age 15, Jennings and his mother moved to Florida and his life "did a 180"—Jennings did not like the Florida school, he was bored, and he felt rejected by his peers, and he got into drugs, alcohol, and street racing; (9) as a teen, Jennings got into a fight with his mother's boyfriend and hospitalized him—the boyfriend had been drunk and attacked Jennings's mother; (10) Jennings dropped out of school his junior year of high school; (11) after dropping out, he "got into bar fights and was into acid, pot, and alcohol"; (12) he had regular employment in various occupations; (13) in 1989 or 1990, when a man threatened a woman Jennings was dating, Jennings kidnapped the man, had a firearm with him, and planned to kill the man, but he was arrested and pleaded no contest to attempted armed robbery (he was sentenced to a year in county jail and five years' probation); (14) while in jail, he was in "30 or 40 fights" but never got in trouble; (15) in 1992, "his life kind of fell apart" and he got heavy into drugs and alcohol and moved back in with his mother; (16) in 1994, he moved in with Mary Hamler—he loved her three kids a lot, but "really didn't care about her"; and (17) after he and Hamler broke up, Jennings moved in with codefendant Graves.

Dr. Wald's report indicated that Jennings self-reported similar information concerning his childhood, educational

history,[14] and background.[15]  Jennings also reported that he saw a psychiatrist when he was eight years' old due to his "bad temper," including one instance where he choked his cousin for laughing at him.  Dr. Wald agreed with Dr. Masterson's assessment that Jennings's testing was all relatively normal and opined that Jennings was very intelligent, with no mental disorders or brain dysfunction, and that Jennings had a "sociopathic personality."[16]

After reviewing their reports, Osteen elected not to call Dr. Wald or Dr. Masterson during the penalty phase.[17]

---

[14] Dr. Wald reviewed Jennings's school records from Florida, noting that they were "essentially non-contributory" to his report and indicated that Jennings struggled with several courses.

[15] Dr. Wald also noted that Jennings suffered a concussion at age 2 or 3 after he was hit on the head by a wooden board, which resulted in his hospitalization, and that Jennings had a lengthy history of drug and alcohol abuse that began in his teens.  Jennings had a "number of prior arrests," primarily for traffic violations, but including a shoplifting arrest in his teens and his arrest on attempted armed robbery.   Jennings also self-reported that he "ha[d] stolen things for both money and . . . the 'adrenalin[e] rush.'" Jennings indicated that "he [sought] gratification, [did] not feel at all remorseful about crimes he ha[d] committed, and ha[d] experienced no guilt relative to legal infractions."

[16] Dr. Wald attempted to interview Jennings's mother, who was very resistant at first, and then she did not show up for the scheduled interview.

[17] Osteen explained that it was part of his trial strategy not to call Dr. Wald or Dr. Masterson as witnesses because, after speaking with them, he "came to the conclusion that [their testimony] would not be helpful to a great extent, and so [he] decided to rely on [Jennings's] mother and his friends to come

21-11591                Opinion of the Court                19

In addition to Osteen's testimony, at the state postconviction evidentiary hearing, Jennings presented testimony from three experts in support of his claims—Dr. Thomas Hyde, a behavioral neurologist, Dr. Hyman Eisenstein, a clinical psychologist and expert in neuropsychology, and Dr. Faye Sultan, a clinical psychologist. Dr. Hyde and Dr. Eisenstein both testified that Jennings suffered a number of closed head injuries[18] and had a history of febrile convulsions (seizures) between the ages of 8 months and 2 years. Dr. Hyde opined that the seizures were a typical indicator of abnormal brain function; and that a history of head trauma may predispose a person to "some long-lasting neurological effects from brain damage." Nevertheless, Dr. Hyde

_____

forward and make as many good statements as they could about the defendant." He also did not want to call the doctors as witnesses because there was information in their reports—such as Jennings's criminal history—that he did not want the jury to know about, particularly because he was arguing for, and received, the no significant criminal history statutory mitigator.

[18] Specifically, Jennings reported to Dr. Hyde and Dr. Eisenstein that he was hit in the head with a 2x4 piece of wood as a toddler; kicked in the head by a pony at age 4 or 5; punched in the face as a teen; ran into a brick wall at age 16; engaged in a head-butting competition as a teen; was involved in multiple fights and suffered blows to the head; and was involved in a motorcycle accident (Jennings denied any head injury from motorcycle accident, but Dr. Eisenstein opined that "it was impossible that he didn't have a closed head injury" from it).

opined that Jennings's neurological examination was normal "for the most part."[19]

Following testing, Dr. Eisenstein opined that Jennings was "gifted" with learning disabilities that went untreated.[20] Dr. Eisenstein also diagnosed Jennings with intermittent explosive disorder, which is characterized by explosive aggressive responses that are not proportionate to the provocation. Dr. Eisenstein opined that the following statutory mitigating circumstances applied to Jennings—(1) his capacity to appreciate the criminality of his conduct or to conform his conduct to the law was impaired, and (2) he was under the influence of an extreme mental or emotional disturbance when he committed the murders.

Dr. Faye Sultan testified that her investigation revealed that Jennings's maternal grandfather was "overtly sexual" with his daughters, and that Tawny (Jennings's mother) was molested by

---

[19] Dr. Hyde noted three "subtle neurological findings"—(1) Jennings's pupils were asymmetrical (one was larger than the other); (2) he had a "postural tremor" in one hand; and (3) he had one unspecified "frontal release sign," but he admitted that these subtle findings can also be present "in normal individuals."

[20] Dr. Eisenstein explained that some of Jennings's scores were excellent, while others were "indicative of a brain dysregulation" and a learning disability. Dr. Eisenstein noted that although both Jennings and his mother indicated that Jennings was a straight-A student, his school records—although missing a number of years—revealed that was not true.

her brother, George "Sonny" Jennings.[21]   Some of the people Sultan interviewed witnessed Jennings sit on Sonny's lap as a child, and Jennings reported that Sonny paid him a quarter to sit on his lap.  Walter Croom, who married one of Jennings's cousins, was also a child molester, and he occasionally babysat Jennings. However, Dr. Sultan confirmed that Jennings denied any sexual abuse and there was no direct evidence indicating that any had occurred, although she speculated it could have given the environment that he grew up in.  Dr. Sultan concluded that Jennings grew up in extreme poverty and neglect and in an environment that involved "the sexualization of children."  She testified that children who grow up in that type of environment "don't develop normally neurologically" and are "quite impulsive, sometimes aggressive, over sexualized themselves, often substance abusers to the extreme."

Based on her interviews with Jennings's mother, Dr. Sultan opined that Tawny was "quite mentally ill"—although she could not offer any formal diagnosis—and Tawny had an "abnormal attachment" to Jennings when he was a child.  Dr. Sultan noted that Tawny "behaved very oddly" toward Jennings, citing the fact that Tawny breastfed him until he was five, and an unspecified

---

[21] Tawny told Jennings at a very young age that she was a victim of sexual abuse, and Dr. Sultan opined that such knowledge produces significant emotional distress in children and "it certainly contributed" to "Jennings'[s] state."  And Jennings stated that at one time, he believed his uncle Sonny might be his biological father.

person Sultan interviewed purportedly witnessed Tawny engage in sex in the presence of Jennings.[22]

Dr. Sultan's interpretation of Jennings's testing results "was quite similar" to Dr. Masterson's interpretation. Dr. Sultan explained that Jennings was of above average intelligence, likely to be a serious substance abuser, had difficulty controlling his anger, was easily frustrated, extroverted, had a rigid personality, and was able to have relationships with other persons, but they were not likely to be long-lasting ones. Dr. Sultan also opined that Jennings had intermittent explosive disorder. She further opined that Jennings did not suffer from any mental illness, and that "he did not meet the standards for [Florida's] statutory mitigators." Nevertheless, she thought Jennings was "quite a damaged person" who "operate[d] in the world . . . in a highly dysfunctional way."

Finally, Jennings presented mitigation testimony from family and friends. Jennings's cousin, Patricia Scudder, testified that, between the ages of 6 and 12, Jennings and Tawny lived in a three-bedroom cabin-type home at the Buccaneer Apartments (also known as the Buccaneer Motel). Scudder stayed with Jennings and his mother for two-week periods on three different

---

[22] Dr. Eisenstein similarly opined that Tawny was not a good mother, lacked parenting skills, and was not an accurate historian of Jennings's background because she had been a victim of physical, sexual, and emotional abuse.

occasions.[23] She described the condition of their apartment during her first stay as "[v]ery, very messy" with clothes piled everywhere and there were "[d]irty [k]otexes" around the apartment. But on cross-examination, she clarified that the reason why she was staying with them was because Jennings's mother had just had surgery, was immobile, and needed help. The second time Patricia stayed with them, Jennings's mother was again having health issues and needed help. On this occasion, Jennings's mother had a new puppy, and there were puppy papers and dog poop on the floor, and dirty dishes everywhere. Patricia stated that Tawny prepared quick simple meals like toast, gravy, or hamburgers, and allowed Jennings to eat a lot of junk food.

According to Patricia, Jennings regularly slept in the same bed with his mother at 5 or 6 years' old. On one occasion, Patricia observed three men stay the night in Tawny's home while Jennings was home. The next morning after two of the men had left, Patricia walked into the apartment, and Tawny and her boyfriend were "cuddled up together" on the hide-a-bed in the living room, unclothed—although not engaged in any sexual act—and Jennings was lying on the floor watching tv. Nevertheless, despite her testimony concerning the squalor of Jennings's living conditions and poor parenting skills of Tawny, Patricia described Jennings's

---

[23] Other than the three two-week periods that Patricia stayed with them, she saw Jennings and his mother "[n]ot very often at all." And she lost touch with them after they moved in 1990, and she did not know anything about the case until years after the trial.

and his mother's relationship as "very loving" and explained that she had never "seen a mother and a son as close" as they were.

Patricia's husband, Lloyd, testified that Sonny molested Patricia, and Croom molested his and Patricia's son, and that Sonny and Croom had the opportunity to be around Jennings. Lloyd also testified that he smoked marijuana with Tawny regularly, and that she also took a lot of pain pills because of health issues. Lloyd thought Tawny was a bad mother—describing her as selfish, unemployed, and a poor housekeeper and cook.[24] Lloyd often took Jennings fishing, taught him how to box, and did other things with him, like a father figure. But Lloyd lost touch with Jennings after Tawny moved from Oregon.

Next, Heather Johnson testified that she was "good friends" with Jennings for a couple of years when they were 17 or 18 years' old. She stated that Jennings often expressed unhappiness, conflict, and resentment with his mother. At the time of Jennings's trial, Johnson no longer lived in Florida, but she was contacted via letter by Jennings's defense team, asking if she could give any "good word" or character statement on behalf of Jennings and whether she knew of anyone else who would be willing to testify on his behalf. She wrote back stating that she was not sure that she could be of much help because she and Jennings had lost contact and had

---

[24] When asked how Tawny supported herself, Lloyd stated that she was on welfare and speculated that she made money "[p]robably hooking."

not spoken in years.[25]   She did not hear back from Jennings's counsel, but she would have been willing to testify.

Lastly, Kevin McBride testified that he was friends with Jennings when they were teenagers in Florida, and, at one point, Jennings lived with him for a few months when Jennings's mother "was in between places."   He described Jennings's mother as a "very nice lady" who was "always friendly" but unstable financially.   He recalled that Jennings and his mother were more like friends than mother and son.   He stated that Jennings drank and used marijuana on a daily basis, and he and Jennings used acid and mushrooms on occasion.[26]   McBride confirmed that he met with one of Jennings's investigators at the time of Jennings's trial, but that he was not asked to testify.

---

[25] Specifically, Johnson advised in her response that "[a]ll [she could] offer [was] a brief summary of the Brandy Bain Jennings that [she] knew and loved, and even that may not be a sterling character reference."   She went on to describe that Jennings was her best friend, confidant, and protector—a big brother type, who taught her things and made her feel safe.   But he was also "often foolish" and would do impulsive things without considering the consequences.   She stated that she believed he could have committed the robbery because it was a way to act out the anger and frustration that he had a difficult time expressing, but she did not believe him capable of murder.   She also advised that she could not think of anyone else who would be willing to help Jennings.

[26] Bruce Martin, half-brother to Kevin McBride, similarly testified at the evidentiary hearing that Jennings drank heavily, used marijuana every day, and used acid about once a week.

### ii.    Trial Court Denies Jennings's Postconviction Motion

Following the evidentiary hearing, the trial court denied Jennings's postconviction motion on the merits. *Florida v. Jennings*, No. 1995-CF-02284, 2011 WL 11573988 (Fla. Cir. Ct. Jan. 31, 2011).   The trial court concluded that counsel's mitigation investigation was not deficient because the record demonstrated that counsel interviewed Jennings's mother and various friends and called witnesses during the penalty phase that he thought could present positive information, which was "proper trial strategy." *Id.* at *4–6.  Finally, the trial court concluded that Jennings could not show prejudice because, even if counsel had introduced all of the information in question, there was no reasonable probability of a different outcome.  *Id.* at *6.  Jennings appealed to the Florida Supreme Court.

### iii.    Florida Supreme Court's Decision

The Florida Supreme Court determined that counsel made a reasonable strategic decision to not present mitigation testimony from Dr. Wald and Dr. Masterson during the penalty phase "because it could open the door to other damaging testimony." *Jennings v. State*, 123 So. 3d 1101, 1114 (Fla. 2013) (*Jennings II*) (quotation omitted).  The court concluded that counsel was not "deficient for choosing to pursue other mitigation evidence that he determined was more likely to help Jennings at trial." *Id.*  Finally, the court held that Jennings failed to establish prejudice because the trial court found as a nonstatutory mitigation that Jennings had a deprived childhood, and the omitted information concerning

Jennings's troubled childhood and emotional development did "not rise to the level of unpresented mitigation previously held to be prejudicial." *Id.* at 1117–18.

### D. Federal § 2254 Habeas Proceeding

Following the denial of state postconviction relief, Jennings filed a § 2254 federal habeas petition in the United States District Court for the Middle District of Florida, raising several claims. As relevant to this appeal, he combined his arguments that counsel was ineffective for failing to conduct an adequate investigation into mental health mitigation and his childhood background into a single claim. Specifically, he argued that counsel was ineffective at the penalty phase because (1) counsel's mitigation investigation was minimal and he failed to obtain medical or school records and failed to provide such records to the experts; and (2) counsel made no effort to truly investigate Jennings's background and childhood, which would have revealed a wealth of compelling mitigation.[27]

The district court denied the petition, concluding that the state court's determination that counsel was not deficient was not contrary to, or an unreasonable application of, *Strickland v.*

---

[27] Jennings also took issue with the adequacy, sufficiency, and competency of Dr. Wald's and Dr. Masterson's reports and Osteen's reliance on those allegedly deficient reports, but as his counsel acknowledged during oral argument, that issue is beyond the scope of the COA in this case. *See Murray v. United States*, 145 F.3d 1249, 1251 (11th Cir. 1998) (holding that "in an appeal brought by an unsuccessful habeas petitioner, appellate review is limited to the issues specified in the COA").

*Washington*, 466 U.S. 668 (1984). *Jennings v. Sec'y, Dep't of Corr.*, No. 2:13-cv-751-FtM-38MRM, 2020 WL 7047706, *9–11 (M.D. Fla. Dec. 1, 2020). Because the district court found that the performance prong was not satisfied, it did not address the prejudice prong. *Id.* The district court denied Jennings a COA, and he sought a COA from this Court. *Id.* at *21. As noted previously, we granted Jennings a COA on one issue: "Whether the district court erred in denying Jennings's claim that his trial counsel rendered ineffective assistance in the penalty phase of his capital trial by failing to conduct further investigation into Jennings's childhood and background."

## II.    Standard of Review

We review the district court's denial of a § 2254 habeas petition *de novo*. *Ward v. Hall*, 592 F.3d 1144, 1155 (11th Cir. 2010).

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") establishes a "highly deferential standard for evaluating state-court rulings, [and] demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)). Thus, under AEDPA, a federal court's review of a final state habeas decision is greatly circumscribed, and a federal habeas court cannot grant a state petitioner habeas relief on any

claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim:

> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2).

"[C]learly established Federal law" means "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). "[T]o be 'contrary to' clearly established federal law, the state court must either (1) apply a rule that contradicts the governing law set forth by Supreme Court case law, or (2) reach a different result from the Supreme Court when faced with materially indistinguishable facts." *Ward*, 592 F.3d at 1155 (quotations omitted); *see also Bell v. Cone*, 535 U.S. 685, 694 (2002).

An "unreasonable application" of federal law occurs "if the state court correctly identifies the governing legal principle from [the Supreme Court's] decisions but unreasonably applies it to the facts of the particular case." *Bell*, 535 U.S. at 694. "[A]n unreasonable application of federal law is different from an incorrect application of federal law." *Williams*, 529 U.S. at 410 (emphasis omitted). "Indeed, 'a federal habeas court may not issue

the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.'" *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quoting *Williams*, 529 U.S. at 411); *see also Shinn v. Kayer*, 141 S. Ct. 517, 523 (2020) ("To meet [the unreasonable application] standard, a prisoner must show far more than that the state court's decision was merely wrong or even clear error." (quotation omitted)). Rather, the state court's application of federal law "must be 'objectively unreasonable,'" *Renico*, 559 U.S. at 773, meaning that "the state court's decision is so obviously wrong that its error lies beyond any possibility for fairminded disagreement, *Shinn*, 141 S. Ct. at 523 (quotations omitted). "This distinction creates a substantially higher threshold for obtaining relief than *de novo* review." *Renico*, 559 U.S. at 773 (quotation omitted).

"[W]hen the last state court to decide a prisoner's federal claim explains its decision on the merits in a reasoned opinion . . . a federal habeas court simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). However, we are not limited by the particular justifications the state court provided for its reasons, and we may consider additional rationales that support the state court's determination. *Pye v. Warden, Ga. Diag. Prison*, 50 F.4th 1025, 1036 (11th Cir. 2022) (en banc). A state court's decision is reasonable "so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."

*Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

In addition, "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). With these principles in mind, we turn to the merits of Jennings's appeal.

## III.    Discussion

Jennings argues that Osteen was constitutionally ineffective by failing to adequately investigate and present mitigation evidence related to his childhood and background, and in failing to obtain and provide relevant background records to Dr. Wald and Dr. Masterson.

To succeed on a claim of ineffective assistance of counsel in violation of the Sixth Amendment, a petitioner must establish two elements. *Strickland*, 466 U.S. at 687. "First, the defendant must show that counsel's performance was deficient." *Id.* Review of counsel's actions is "highly deferential" and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.

"Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* at 687. Prejudice occurs when there is a reasonable probability that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "When a defendant challenges a death

sentence . . . the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."[28]  *Id.* at 695. "The likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112.  In determining whether there is a reasonable probability of a different result, a court must "consider 'the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding'—and 'reweig[h] it against the evidence in aggravation.'" *Porter v. McCollum*, 558 U.S. 30, 41 (2009) (quoting *Williams*, 529 U.S. at 397–98).

Because both prongs of the *Strickland* standard "must be satisfied to show a Sixth Amendment violation, a court need not address the performance prong if the petitioner cannot meet the prejudice prong, and vice-versa." *Ward*, 592 F.3d at 1163. Furthermore, the *Strickland* standard is a general standard, which means that "a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009); *see also Renico*,

---

[28] Again, at the time of Jennings's trial, only a majority 7-5 vote was necessary to recommend death.  *Reynolds*, 251 So. 3d at 827 (explaining that under Florida's old capital sentencing scheme, a jury "had various options for recommendations, including life, 7–to–5 death, 8–to–4 death, 9–to–3 death, 10–to–2 death, 11–to–1 death, and unanimous death outcomes").

559 U.S. at 776 ("Because AEDPA authorizes federal courts to grant relief only when state courts act unreasonably, it follows that '[t]he more general the rule' at issue—and thus the greater the potential for reasoned disagreement among fair-minded judges—'the more leeway [state] courts have in reaching outcomes in case-by-case determinations.'" (quoting *Yarborough*, 541 U.S. at 664)).

Here, we need not address Jennings's arguments related to the performance prong because the Florida Supreme Court's determination that Jennings failed to establish prejudice was not contrary to, or an unreasonable application of, *Strickland* or based on an unreasonable determination of the facts. The mitigation evidence offered in Jennings's postconviction proceedings primarily related to non-statutory mitigation. Specifically, in addition to Jennings's positive character traits and relationships that the jury and judge originally heard during the penalty phase, had the evidence submitted at the postconviction proceeding been presented at the penalty phase, the jury and the sentencing judge would also have learned of Jennings's chaotic childhood; his mother's poor parenting skills; his family's history of sexual abuse;[29] Jennings's drug and alcohol abuse; his history of head

---

[29] Jennings argues that the Florida Supreme Court unreasonably discounted the evidence of sexual abuse in his family and the effect that such an environment would have had on Jennings's emotional and mental development in contravention of the Supreme Court's decision in *Porter*. Contrary to Jennings's argument, the Florida Supreme Court did not discount the evidence of sexual abuse to "irrelevance" but instead determined that it was of minimal value because evidence of sexual abuse of Jennings's family

injuries and febrile seizures; that his neurological testing was normal despite repeated head injuries; that he did not have any mental illness; that he had intermittent explosive disorder and that two experts believed he had sociopathic personality traits; that Jennings had above-average intelligence; and that he had a history of criminal acts, some of which were violent.

Given the facts of this case, it was not unreasonable for the state court to conclude that Jennings was not prejudiced by counsel's failure to present the mitigation evidence in question during the penalty phase. As an initial matter, there is a significant probability that much of the omitted mitigation evidence when combined with that adduced at trial, would have undermined some of the mitigating factors that the trial court found—namely, that (1) Jennings had no significant prior criminal history (Jennings's only statutory mitigating factor), (2) he had a close, loving relationship with his mother, and (3) he had "positive personality traits enabling the formation of strong, caring relationships with peers." And we have held that it is not an

---

members "might have been mitigating in establishing [his] troubled childhood and emotional development," but the trial court already found as a non-statutory mitigating factor that he had a deprived childhood. *Jennings II*, 123 So. 3d at 1118. It was not contrary to, or an unreasonable application of, clearly established federal law for the Florida Supreme Court to determine that the evidence of familial sexual abuse was of minimal value given that Jennings expressly denied any personal history of sexual abuse, and there was no other evidence indicating that Jennings himself suffered any sexual abuse from any family members.

unreasonable application of *Strickland* to conclude that there is no prejudice when much of the mitigation evidence would have constituted a double-edged sword. *See Gavin v. Comm'r, Ala. Dep't of Corr.*, 40 F.4th 1247, 1269 (11th Cir. 2022) (holding that mitigation evidence "could have been a double-edged sword," and, therefore, the state court reasonably applied *Strickland* when it concluded that petitioner could not establish prejudice); *Ponticelli v. Sec'y, Fla. Dep't of Corr.*, 690 F.3d 1271, 1296 (11th Cir. 2012) ("[B]oth the Supreme Court and this Court have consistently rejected [the] prejudice argument [ ] where mitigation evidence was a two-edged sword or would have opened the door to damaging evidence." (second and third alterations in original) (quotations omitted)).

Furthermore, there were significant aggravating factors present in this case—(1) the murders were committed while Jennings was engaged in or was an accomplice in the commission of a robbery; (2) the murders were committed for the purpose of avoiding or preventing a lawful arrest or to effectuate an escape from custody; and (3) the crimes were committed in a cold, calculated, premeditated manner. Notably, the cold, calculated, and premeditated factor is one of "the weightiest aggravating factors in Florida's capital sentencing scheme." *Carr v. State*, 156 So. 3d 1052, 1071 (Fla. 2015) (quotations omitted). And as the state postconviction court noted, the nature of, and circumstances surrounding, the three murders in this case were particularly heinous. "We've repeatedly held that even extensive mitigating

evidence wouldn't have been reasonably likely to change the outcome of sentencing in light of a particularly heinous crime and significant aggravating factors." *Pye*, 50 F.4th at 1049 (collecting cases); *see also Puiatti v. Sec'y, Fla. Dep't of Corr.*, 732 F.3d 1255, 1287–88 (11th Cir. 2013) (holding that petitioner could not show prejudice based on mitigation evidence of depraved, impoverished, and abusive childhood where one of the aggravating factors was the cold, calculated, and premeditated aggravator). Thus, in light of the facts of this case, we cannot say that the Florida Supreme Court's determination that Jennings did not suffer prejudice was so obviously wrong as to be beyond any possibility for fairminded disagreement, which is "the only question that matters" under § 2254(d). *Shinn*, 141 S. Ct. at 526; *see also Jones v. Sec'y, Fla. Dep't of Corr.*, 834 F.3d 1299, 1312–17 (11th Cir. 2016) (holding that state court's determination that the petitioner failed to demonstrate prejudice was reasonable where the mitigating evidence was of limited value and there were significant aggravating factors).

To the extent that Jennings argues that his case is analogous to *Porter* or *Sears v. Upton*, 561 U.S. 945 (2010), and that those cases compel a finding of prejudice in this case, his argument is unpersuasive. The mitigating evidence in *Porter* was significantly more compelling than that presented in Jennings's case. For instance, in *Porter*, the jury never heard that (1) he suffered from brain damage that could result in "impulsive, violent behavior"; (2) that he had "heroic military service in two of the most critical— and horrific—battles of the Korean War"; (3) he suffered from

mental health issues following the war; (4) he had an extensive history of childhood physical abuse by his father; and (5) that Porter was in special education classes and left school at the age of 12 or 13. 558 U.S. at 33–37, 41. More importantly, in *Porter*, the Supreme Court reasoned that, had the jury heard this extensive mitigation, there was a reasonable probability that the jury would have struck a different balance given that there appeared to be only one aggravating factor that tipped the scales in favor of a death sentence. *Id.* at 41–42. In contrast, although Jennings's mitigation evidence included details about a deprived and impoverished childhood and that he had a history of head trauma, there was no evidence of brain dysfunction, mental illness—indeed Jennings's experts opined that he was very intelligent with no mental disorders or brain dysfunction—or physical or sexual abuse, and Jennings's death sentence was supported by three significant aggravating factors. Given the significant differences between *Porter* and the case at hand, *Porter* cannot compel a finding of prejudice in this case.

Similarly, the mitigation evidence in *Sears* was far stronger than that in Jennings's case. The mitigation evidence in *Sears* included that (1) Sears "suffer[ed] from substantial cognitive impairment" and he was "among the most impaired individuals in the population in terms of ability to suppress competing impulses and conform behavior"; (2) he had a history of head trauma and "significant frontal lobe abnormalities"; (3) he grew up in a volatile, physically abusive home; and (4) he suffered sexual abuse from a

family member.  561 U.S. at 948–50.  Furthermore—and this is a crucial difference—*Sears* was not subject to AEDPA's deferential review standard because the *Sears* appeal was not from a federal petition for a writ of habeas corpus; instead, Sears had appealed from the state court's decision directly to the United States Supreme Court.  *Id.* at 946.  Moreover, *Sears* did not involve a finding of prejudice.  Rather, the Supreme Court determined that the state court failed to apply the proper prejudice inquiry, and it remanded the case for the state court to conduct "[a] proper analysis of prejudice" in the first instance.  *Id.* at 956 ("It is for the state court—and not for either this Court or even [the dissenting Justice]—to undertake [the prejudice inquiry] in the first instance.").  Thus, *Sears* cannot compel a finding of prejudice in Jennings's case.

Accordingly, we affirm the district court's denial of Jennings's habeas petition.

**AFFIRMED.**